642 A.2d 906

**Deborah LEGG**

v.

**Sadie CASTRUCCIO, et al.**

**No. 1652, Sept. Term, 1993.**

Court of Special Appeals of Maryland.

June 13, 1994.

750

Mary Agnes Sheehan (Janet E. LaBella, on the brief), Annapolis, for appellant.

J. Joseph Curran, Jr., Atty. Gen., and Jacqueline Wei Mintz, Asst. Atty. Gen., Baltimore, for amicus curiae Consumer Protection Div.

Peter A. Castruccio, Gambrills, for appellees.

Argued before MOYLAN, DAVIS and HARRELL, JJ.

DAVIS, Judge.

This is an appeal from a September 2, 1993 judgment and order of the Circuit Court for Anne Arundel County. The dispute is between landlords Sadie and Peter Castruccio (ap-

pellees) and their former tenant Deborah Legg (appellant). An amicus curiae brief has also been filed by the Consumer Protection Division of the Office of the Attorney General (Division or amicus).

Amicus asserts an interest in this case because it "is the state agency charged with the responsibility for enforcing the Consumer Protection Act ... and several related laws for the protection of consumers." Amicus adopted appellant's statement of the case, statement of facts, and argument regarding the covenant of quiet enjoyment, but wrote separately on the issues involving the application of the Maryland Consumer Protection Act (CPA).

The parties' dispute began when the Castruccios brought a claim in the Anne Arundel County District Court for repossession of rented property. On the trial date, November 20, 1991, Legg filed defenses and counterclaims and a request for a jury trial. The case was transferred to the Circuit Court for Anne Arundel County. Legg filed an amended answer and amended counterclaim that sought rent abatement, damages, and attorneys' fees because "the Castruccios had illegally rented her an apartment in an unlicensed multiple dwelling containing numerous unsafe conditions." She also claimed that "[b]y representing to [her] that one-half of the [utility bills [1]] would be paid by the upstairs tenant but which in fact has not been paid, [the Castruccios] engaged in unfair or deceptive trade practices in the rental and offer of rental of consumer realty...."

On May 5, 1993, the parties entered into a settlement that resolved all of the issues except whether the Castruccios have any legal responsibility for the unpaid utility bills of their upstairs tenant. A bench trial was held on June 22, 1993. Legg, Judith Papilon, one of the upstairs tenants, and Andrea

---

1. The parties in this action, as well as the trial judge, inconsistently use the term "utility bill," "electric bill" and "electric and gas bill." It is clear that all references are to the Baltimore Gas and Electric Company (BG & E) bill in the name of Deborah Legg. We shall simply refer to this bill as the "utility bill."

Compost, a BG & E representative, testified at trial, but the Castruccios did not. The trial judge, addressing "only the question of the Castruccios'˙ liability for the unpaid balance owing on Legg's utility service bill" issued a written opinion and order dated September 2, 1993 in favor of the Castruccios. The court opined that the Castruccios' refusal to pay Legg for the upstairs tenants' utility service (1) did not create a dangerous defect under MD.CODE (1974, 1988 Repl.Vol.), § 8–211(e)(1) of the REAL PROPERTY ARTICLE; (2) was not an illegal appropriation of utility charges under MD.ANN.CODE Art. 78 § 54G(d)(1); (3) was not a breach of the covenant of quiet enjoyment; (4) was not a breach of an agreement for the landlords to pay the utility service; and (5) was not a deceptive or unfair trade practice under the Maryland Consumer Protection Act or Federal Trade Commission consumer unfairness doctrine. Legg appeals from that judgment and presents the following questions:

I.    Is it a deceptive trade practice, in violation of the Consumer Protection Act, for a landlord to fail to inform a tenant at the commencement of the lease that another apartment's electric service is on her utility meter and to fail to inform her at the inception of her tenancy and subsequently that she will bear the risk of the other tenant's nonpayment for their utility usage?

II.    Is it ... an unfair trade practice[ ], in violation of the Consumer Protection Act, ... for a landlord to burden a tenant with [other] tenants' utility service and with the risk of the other tenants' nonpayment for their utility usage?

III.    Is it ... a breach of the covenant of quiet enjoyment for a landlord to burden a tenant with [other] tenants' utility service and with the risk of the other tenants' nonpayment for their utility usage? [2]

---

**2.** For reasons of which we are unaware, Legg presented her unfair trade practices question and her covenant of quiet enjoyment question in a single compound question. Because her brief treats them sepa-

## FACTS

From April or May 1987 until November 20, 1991, the date the parties were scheduled for trial in the district court, Deborah Legg rented an apartment on the ground floor of a two-story house at 1139 Discus Mill Road from Sadie and Peter Castruccio on a verbal, month-to-month basis. The upstairs level was not occupied at the time. The parties agreed that Legg would pay rent to the Castruccios and would establish her own account for gas and electric service. Thereafter, Legg opened an account with BG & E, and the only utility meter on the premises was put into service.

Sometime after Legg's tenancy began, a person named David moved into an upstairs apartment. The record extract is bereft as to who David was and how he came to rent the apartment. Legg testified that, pursuant to her oral agreement with him, David paid one-fourth of the utility bills, that he made his payments, and that she is seeking no redress regarding the period David lived in the upstairs apartment. For unknown reasons, the trial judge's opinion and Legg's brief do not address this first upstairs tenancy.

In June or July 1988, the Castruccios rented the upstairs apartment to Julie Papilon and Vinnie Harcourt under a verbal, month-to-month lease. The trial judge's opinion makes no mention of Julie Papilon and indicates only that Harcourt was the upstairs tenant. This is misleading because Papilon testified at trial that she lived in the upstairs apartment, that the Castruccios were her landlords, and that she was the tenant who paid the rent to the Castruccios every month (Harcourt apparently was responsible for the utility bills). To prevent any further confusion, we shall refer to Papilon and Harcourt jointly as the "upstairs tenants" or "Papilon–Harcourt tenancy."

Papilon testified that Sadie Castruccio told her that she would have to pay one-half of the utility bills. Legg was not

---

rately and does not explain how these two areas of law are related, we shall treat them as two distinct questions.

consulted in advance regarding the Papilon–Harcourt tenancy, but was informed by Sadie Castruccio that Papilon and Harcourt agreed to pay one-half of the utility bills. The trial judge found that "[t]he Castruccios prompted Legg to discuss the [utility bills] with [the upstairs tenants] from the beginning of [their] tenancy."

Following her discussion with Sadie Castruccio, Legg discussed the utility bills directly with the upstairs tenants. The upstairs tenants verbally agreed with Legg that they would pay one-half of the utility bills. A letter dated December 3, 1990, addressed "TO WHO IT MAY CONCERN" and signed solely by Sadie M. Castruccio, confirms that Sadie Castruccio was aware that an agreement was made between Papilon, Harcourt, and Legg, and that the Castruccios expected the upstairs tenants to pay their half. It reads:

> This is to verify that Mr. Vincent Harcourt and Ms. Julia Papilon rent from me the premises at 1139 Discus Mill Road, Millersville, Maryland 21108, and that they are responsible for payment of one-half of the [utility] bill, which is in the name of Ms. Deborah Legg. They are also responsible for payment of the entire heating oil bill.

Beginning July 1990, approximately two years after moving in, the upstairs tenants stopped paying Legg their share of the utility bills. From July 1990 until December 2, 1991, the cost of utility service totalled $4,310.73 (including late fees), making the upstairs tenants' share $2,155.36. Of this amount, Papilon and Harcourt paid only $140, leaving a remaining balance of $2015.36. Testimony of Andrea Compost, a BG & E representative, indicated that despite payments made by the upstairs tenants, Legg herself was in arrears with BG & E even before the upstairs tenants moved into that apartment. The actual amount of this arrearage was never established. Nonetheless, the utility service was never turned off while Legg lived at 1139 Discus Mill Road.

At some undetermined time after the upstairs tenants stopped paying their share of the utility bills, Legg complained to the Castruccios and requested that separate meters

be installed. According to Legg, the Castruccios said that "they would take care of it." Legg's testimony did not explicitly indicate that she told the Castruccios that the upstairs tenants were not paying the utility bills; it can, therefore, only be inferred that the Castruccios were aware of the upstairs tenants' delinquency when Legg asked for separate meters, as that was apparently the only reason that she was asking for separate meters.

Sometime in early November, 1991, the upstairs tenants moved out of 1139 Discus Mill Road without paying their remaining share of the utility bills. No security deposit was held by the Castruccios from the Papilon–Harcourt tenancy. The Castruccios never attempted to evict the upstairs tenants. The Castruccios have refused to pay any portion of the utility bills for 1139 Discus Mill Road. Legg has never brought a legal action against either of the upstairs tenants for failure to pay their share of the bills.

On November 20, 1991, Legg moved out of 1139 Discus Mill Road. The current balance on the BG & E bill for 1139 Discus Mill Road is $2,092.01, and Legg is in danger of having her current electric service turned off at her new residence based on this prior unpaid balance.

## LEGAL ANALYSIS

### Background

The purpose of the Maryland Consumer Protection Act (CPA) is well established. MD.CODE (1975, 1990 Repl.Vol.), § 13–102 of the COMMERCIAL LAW ARTICLE [hereinafter CPA]; *CitaraManis v. Hallowell,* 328 Md. 142, 613 A.2d 964 (1992); *Golt v. Phillips Bros. & Assocs.,* 308 Md. 1, 517 A.2d 328 (1986). The Legislature's goal in enacting the CPA was to provide protection against unfair or deceptive practices in consumer transactions by "implement[ing] strong protective and preventative measures to assist the public in obtaining relief from unlawful consumer practices and to maintain the health and welfare of the citizens of the State." *CitaraManis,* 328 Md. at 150, 613 A.2d 964 (citing CPA § 13–102). In 1976,

the CPA was amended to include consumer real estate. *Id.* at 150, 613 A.2d 964; CPA § 13–303(1) and (2).

Actions under the CPA may be brought by the Division or by private consumers. *CitaraManis,* 328 Md. at 150, 613 A.2d 964. Although the Division is not required to show actual deception or damage, CPA § 13–302, a private consumer bringing an action under the CPA must show actual injury or loss sustained as the result of a practice prohibited under the CPA. CPA § 13–408; *see also Galola v. Snyder,* 328 Md. 182, 185–86, 613 A.2d 983 (1992) (recapitulating the holding of *CitaraManis* ); *CitaraManis,* 328 Md. at 151–53, 613 A.2d 964; *Golt,* 308 Md. at 12, 517 A.2d 328. The rationales undergirding the actual injury or loss requirement include preventing aggressive consumers from acting as self-appointed private attorneys general in situations in which the statutory violation did not personally harm the consumer and the violation was relatively minor, and the fear that consumers would use the statute's power to harass or coerce merchants. *CitaraManis,* 328 Md. at 152, 613 A.2d 964 (quoting 1 H. ALPERIN & R. CHASE, CONSUMER LAW: SALES PRACTICES AND CREDIT REGULATION § 136 at 193 (1986)). The Division may initiate an action after a consumer files a complaint, CPA § 13–401, or after its own findings indicate a violation of the CPA. *CitaraManis,* 328 Md. at 150, 613 A.2d 964. The Division may seek an injunction, cease and desist order, restitution, and civil penalties. CPA §§ 13–401 through 406 and 13–410. The CPA also provides for criminal prosecution of violators. CPA § 13–411. A private consumer is not forced to elect between utilizing either the public or private enforcement proceedings but may proceed with both public and private enforcement. *CitaraManis,* 328 Md. at 151, 613 A.2d 964. The record in this case indicates only that Legg brought a private action pursuant to CPA § 13–408, "Action for damages," which provides:

(a) *Actions authorized.*—In addition to any action by the Division or Attorney General authorized by this title and any other action otherwise authorized by law, any person

may bring an action to recover for injury or loss sustained by him as the result of a practice prohibited by this title.

(b) *Attorney's fees.*—Any person who brings an action to recover for injury or loss under this section and who is awarded damages may also seek, and the court may award, reasonable attorney's fees.

(c) *Frivolous actions.*—If it appears to the satisfaction of the court, at any time, that an action is brought in bad faith or is of a frivolous nature, the court may order the offending party to pay to the other party reasonable attorney's fees.

CPA § 13–303, "Practices generally prohibited," states that "[a] person may not engage in any unfair or deceptive trade practice...." CPA § 13–301 provides a nonexclusive list "defining" unfair or deceptive trade practices. In addition, "[i]t is the intent of the General Assembly that in construing the term 'unfair or deceptive trade practices', due consideration and weight be given to the interpretation of § 5(a)(1) of the Federal Trade Commission Act by the Federal Trade Commission and the federal courts." CPA § 13–105.

Maryland appellate courts have not yet been called upon to distinguish between "unfair" and "deceptive" trade practices. The Federal Trade Commission and federal courts, however, have often treated them as separate and distinct prohibited practices. *E.g., American Financial Servs. Assn. v. F.T.C.,* 767 F.2d 957, 971 n. 15 (1985) [hereinafter A.F.S.A.] (stating that the FTC's reliance on a consumer unfairness rationale as an independent basis for its actions is of relatively recent origin); *Pfizer, Inc.,* 81 F.T.C. 23 (1972) (stating that "[t]he Commission's jurisdiction to proscribe 'unfair' commercial practices has been utilized frequently as an independent basis for Commission action.").

In *Golt,* 308 Md. at 8–9, 517 A.2d 328, the Court of Appeals reviewed three forms of unfair or deceptive trade practice listed in CPA § 13–301.

(1) False, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any

kind which has the capacity, tendency, or effect of deceiving or misleading consumers;

(2) Representation that: (i) Consumer ... realty ... have a sponsorship, approval, accessory, characteristic ... which they do not have;

.       .       .       .       .

(3) Failure to state a material fact if the failure deceives or tends to deceive....

In that case, John Golt, an elderly, disabled retiree, responded to an advertisement placed by Phillips Brothers for a furnished, multi-family, rental apartment. When Golt inspected the premises, he found that repairs were necessary. Despite assurances from Phillips Brothers that those repairs would be made, the repairs were never made. Golt filed a complaint with the Baltimore City Department of Housing and Community Development regarding the condition of the apartment. A City housing inspector concluded that the unit was not licensed as required by the Baltimore City Code for multifamily use and that there were numerous housing code violations, including lack of a toilet, no fire doors, defective door locks, and no fire exits. Rather than make the necessary repairs, Phillips Brothers evicted Golt during his lease term. *Golt,* 308 Md. at 5–6, 517 A.2d 328.

A violation of CPA § 13–301(1) was found because Phillips Brothers rented an apartment to Golt without informing him that the advertised rental apartment was not licensed for rental in violation of the Baltimore City Code, art. 13, § 1101 (1983). The Court held that "[i]mplicit in any advertisement and rental of an apartment is the representation that the leasing of the apartment is lawful." *Golt,* 308 Md. at 9, 517 A.2d 328. Since the Phillips Brothers apartment was not lawfully licensed, the advertisement was a "misleading ... statement ... or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers." *Id.* (quoting CPA § 13–301(1)).

Regarding CPA § 13–301(2), the Court stated that a false representation that a leased apartment is lawful is "in essence

a representation that the 'realty ... [has] a sponsorship, approval ... [or] characteristic ... which [it does] not have' ...—namely, licensing for operation as a multiple family dwelling." *Golt*, 308 Md. at 9, 517 A.2d 328 (quoting CPA § 13–301(2)). Moreover, the Court held that in the context of the CPA "the meaning of any statement or representation is determined not only by what is explicitly stated, but also by what is reasonably implied." *Id.*

Regarding CPA § 13–301(3), the Court opined that an omission of fact is considered material "if a significant number of unsophisticated consumers would attach importance to the information in determining a choice of action." *Golt*, 308 Md. at 10, 517 A.2d 328 (citations omitted). Thus, the *Golt* Court concluded that "the lack of proper licensing for an apartment under most circumstances is a material fact that any tenant would find important in his[/her] determination whether to sign a lease agreement and move into the premises." *Id.*

# I

Legg's first argument is that the Castruccios committed a deceptive trade practice when they failed to inform her that

1) when she obtained [utility] service in her name for her own apartment, she would also be potentially liable for the utility bill of anyone they chose to rent the other apartment;

2) [utility] service to her own apartment would be threatened if their other tenants failed to pay for their [utility] usage;

3) the Castruccios' [sic] would take no action to attempt to correct the problem if the other tenants did not pay for their [utility] usage; and

4) they would, in the end, simply wash their hands of the predicament they had placed her in, leaving Ms. Legg responsible for the [utility] usage of their other tenants.

### A Single Utility Meter

■ The undisputed facts of this case are that the Castruccios did not make Legg aware that her utility bill also would include the utility usage of the upstairs apartment until some time after she leased the downstairs apartment. In our view, a significant number of unsophisticated consumers who are shopping for a rental unit and are told that they must establish an account with the utility company and pay the utilities in addition to rent would attach importance to whether his/her bill will include utility usage of other tenants. Moreover, whether the Castruccios intended to deceive Legg is irrelevant. *Golt*, 308 Md. at 10, 517 A.2d 328. The Castruccios' failure to make this fact known to Legg prior to her tenancy was a "[f]ailure to state a material fact" that deceived Legg in violation of CPA § 13–303(3).

Nonetheless, since this is a private action pursuant to CPA § 13–408, it can only be maintained if the Castruccios' prohibited acts caused Legg's damages. *CitaraManis*, 328 Md. at 153, 613 A.2d 964. The trial court found that Legg's damages were not actually caused by the Castruccios' failure to disclose the utility situation to Legg because once she was aware that her account was for the entire house, she freely agreed to the billing arrangement. Thus, the trial judge opined: "It is incongruous to argue on the one hand that Legg knew of the arrangement from the beginning, and on the other hand argue that the Castruccios' [sic] deceived Legg by misleading her in some way regarding the agreement."

Once Legg was made aware of the billing arrangement, she made a voluntary agreement with the upstairs tenants, David Bushell and later Harcourt and Papilon, to share the utility costs. These agreements caused Legg no problem for over two years. Legg had a month-to-month lease and could have moved to a new apartment but she did not. Once she was aware of the material facts regarding the billing, Legg made a conscious choice to accept that arrangement and stay on the premises. The arrangement only became unacceptable when the upstairs tenants stopped paying their share of the utility

bills. Thus, Legg's damages were the result of the upstairs tenants' delinquency and not the fact that she did not initially know that the utility bill included the upstairs tenants' utility usage.

## Continued Utility Service Threatened

■ Legg's second assertion of deception is without merit because it speaks only in terms of threats and not actual harm. The record is undisputed that Legg's utility service was never terminated while she lived at 1139 Discus Mill Road and that service has not been terminated at her present residence. In addition, we are not persuaded that it was the Castruccios' burden to inform Legg that if she did not pay a utility bill in her name the utility company would threaten to disconnect service. To be sure, any unsophisticated consumer would find it important to know that if he/she did not pay his/her utility bill, his/her service would be terminated; information regarding utility billing, however, is properly the jurisdiction of the utility company. Moreover, the Castruccios' letter clearly indicates that they did not intend to be liable for the failure of the tenants of either apartment to pay their respective share of the utility bill.

## Failure to Act or Take Responsibility

Legg asserts that the Castruccios deceived and/or misled her when they did not inform her that "they would take no action to attempt to correct the problem" if the upstairs tenants failed to pay her their share of the utility bills, and that "they would, in the end, simply wash their hands of the predicament." Both of these allegations are broad and vague. This fundamental problem is compounded by the structure of Legg's supporting arguments.

Apparently, Legg believed that Sadie Castruccio's statement that she "would take care of it" after being requested to install separate meters mislead her into believing that "she would not be held responsible for the upstairs tenants' utility service charges." This argument is without logic because Legg's testimony was that Sadie Castruccio was responding to

her request for separate meters, not a request to pay the upstairs tenants' share of the utility bills. Since this conversation was not regarding payment of utility bills, it could not have misled Legg into believing that the Castruccios would pay those bills.

Legg further contends that "Mrs. Castruccio's assurance that the upstairs tenants would be responsible for one-half of the [utility] bill" misled her into believing that the Castruccios would "require" the upstairs tenants to pay their share. Legg never expressly states what she believed the Castruccios could do to "require" the upstairs tenants to pay. Legg's separate argument regarding the covenant of quiet enjoyment suggests that the Castruccios could have evicted the upstairs tenants, and thereby mitigated her damages, but she does not suggest that the Castruccios could have legally "required" the upstairs tenants to pay Legg the past due amount.

The most, therefore, Legg can contend only that the Castruccios deceived her into believing they would take appropriate legal action to evict the upstairs tenants if the tenants were delinquent in paying their share of the utility bills. This is essentially a question of whether the Castruccios breached the covenant of quiet enjoyment; since Legg would not be entitled to a double recovery, we also consider this issue as a potential breach of the covenant of quiet enjoyment.

## II

Legg next argues that the Castruccios violated the CPA's prohibition against "unfair" trade practices. She asserts three particular unfair trade practices:

1) preventing Ms. Legg from obtaining utility services, which they were required by law to make available, and without which her home would have been uninhabitable, unless the service for their other tenants was also in her name;

2) refusing to take any action to correct the problem when the upstairs tenants stopped paying; and

3) requiring Ms. Legg to bear the risk of the other tenants' nonpayment.

Legg suggests that this Court should follow the approach followed by the FTC and federal courts and permit a cause of action for unfair trade practices independent from deceptive trade practices. Relying on *Golt*, 308 Md. at 8, 517 A.2d 328, Legg contends that although the CPA does not provide an independent definition of unfair trade practice, and although the prohibited acts enumerated in the act "primarily involve deception," the list was never intended to be exhaustive. Thus, pursuant to CPA § 13–105, Legg urges us to adopt the FTC's current standards for finding an unfair trade practice as set forth in the FTC's 1980 Policy Statement to Congress. *See* Policy Statement, *infra*.

Amicus also urges us to define a cause of action for unfair trade practices under the CPA. Unlike Legg, amicus argues that this Court should adopt the superseded federal regulatory standards defined in 1964 because the 1980 standards are repugnant to the CPA.

Section 13–105 of the CPA requires that, in construing the term "unfair or deceptive trade practices," we give due "consideration and weight" to the interpretation of that term by the FTC and federal courts. Pursuant to that mandate, a review of the relevant FTC actions and federal jurisprudence is warranted.

## A

### Scope of the Consumer Unfairness Doctrine in the FTC and Federal Courts

Congress created the FTC in 1914, delegating to it the limited power to determine and prevent " 'unfair methods of competition' in commerce." *A.F.S.A.*, 767 F.2d at 965 (citing Federal Trade Commission Act, ch. 311, § 5, 38 Stat. 719 (1914) (current version at 15 U.S.C. § 45(a)(1))). Congress specifically rejected enacting a statutory definition of the term

"unfair methods of competition." *Id.* A House Conference Report articulated the prevailing thought:

It is impossible to frame definitions which embrace all unfair practices. There is no limit to human inventiveness in this field. Even if all known unfair practices were specifically defined and prohibited, it would be at once necessary to begin over again. If Congress were to adopt the method of definition, it would undertake an endless task. It is also practically impossible to define unfair practices so that definition will fit business of every sort in every part of this country. Whether competition is unfair or not generally depends upon the surrounding circumstances of the particular case. What is harmful under certain circumstances may be beneficial under different circumstances.

*Id.* at 966 (quoting H.R.Conf.Rep. No. 1142, 63d Cong., 2d Sess. 19 (1914)).

Early on, the judiciary attempted to limit the FTC's broad discretionary power to practices that hindered competition or tended to create monopolies. These attempts were subsequently overturned by congressional and judicial action. *Id.* at 966; *see also FTC v. R.F. Keppel & Bros., Inc.,* 291 U.S. 304, 54 S.Ct. 423, 78 L.Ed. 814 (1934) and the Wheeler–Lee Amendment to the Federal Trade Commission Act made in 1938. Ch. 49, § 3, 52 Stat. 111 (1938) (codified at 15 U.S.C. § 45(a)).

The Wheeler–Lee amendment, *inter alia*, " 'broaden[ed] the powers of the Federal Trade Commission over unfair methods of competition by extending its jurisdiction to cover unfair or deceptive acts or practices in commerce.' " *A.F.S.A.,* 767 F.2d at 966 (quoting H.R.Rep. No. 1613, 75th Cong., 1st Sess. 1 (1937)).

Despite the Wheeler–Lee amendment in 1938, a growing consumer consciousness in the 1960's and two critical oversight studies made of the FTC prompted Congress to conclude that " 'the FTC continued to be hampered as an effective force in promoting fair and free competition and safeguarding consumer public against unfair or deceptive acts or practices by

the scope of its authority being limited to matters 'in commerce' and by being made to rely solely on cease and desist order procedure for enforcement.' " *Id.* at 967 (quoting H.R.Rep. No. 1107, 93 Cong., 2d Sess. 29 (1974). In response, Congress enacted the Magnuson–Moss Warranty–Federal Trade Commission Improvement Act " 'to codify the Commission's authority to make substantive rules for unfair or deceptive acts or practices in or affecting commerce.' " *Id.* at 967 (quoting H.R.Conf.Rep. No. 1606, 93d Cong., 2d Sess. 31 (1974) (footnote omitted)).

Enactment of the Wheeler–Lee Amendment and the Magnuson–Moss Act legitimized the Commission's authority to set rules governing unfair or deceptive practices, but what standards were to be applied by the Commission or the judiciary remained deeply obscured. *Id.* at 967. In light of the remaining broad authority that Congress granted the Commission in 1914 to define unfair competition, the Courts "accordingly adopted a malleable view of the Commission's authority." *Id.* at 967–68. Of course, the judiciary remains the final arbiter as to questions of statutory construction. *Id.*

As a byproduct of controversy surrounding the FTC's exercise of its consumer unfairness authority in the late 1970's [3], the FTC provided a "definition" of unfair trade practices. *Id.* at 969–70. The definition came in the form of a 1980 policy statement made at the request of Congress. *See* Letter from Federal Trade Commission to Senators Ford and Danforth (Dec. 17, 1980), *reprinted in* H.R.Rep. No. 156, Pt. 1, 98th Cong., 1st Sess. 33–40 (1983) [hereinafter Policy Statement

---

**3.** The controversy was epitomized by the Commission's attempt to regulate television advertising directed at children. *A.F.S.A.*, 767 F.2d at 969. Congressional response to the controversy included enactment of the Federal Trade Commission Improvement Act of 1980, Pub.L. No. 96–252, 94 Stat. 374 (codified as amended in scattered sections of 15 U.S.C.), which suspended the Commission's rule-making power for children's advertising and "placed a moratorium on the initiation of any new rule making aimed at regulating commercial advertising as an unfair practice pending congressional oversight hearings." *A.F.S.A.*, 767 F.2d at 969.

with page references to H.R.Rep. No. 156], *quoted in A.F.S.A.*, 767 F.2d at 970.

The Policy Statement, subscribed to by each commissioner, attempted to "delineate . . . a concrete framework for future application of the Commission's unfairness authority." Policy Statement at 34. The Commission suggested that the "present understanding of the unfairness standard is the result of an evolutionary process." *Id.* at 35. Thus, the Commission began with its earlier three-part standard of unfairness:

By 1964 enough cases had been decided to enable the Commission to identify three factors that it considered when applying the prohibition against *consumer unfairness.*

*Id.* at 35 (emphasis added). These factors were:

"(1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers (or competitors or other businessmen)."

*Id.* at 35 n. 8. (quoting Statement of Basis and Purpose, Unfair or Deceptive Advertising and Labeling of Cigarettes in Relation to the Health Hazards of Smoking, 29 Fed.Reg. 8324, 8355 (1964)) [hereinafter 1964 standard].

The Policy Statement notes that the Supreme Court quoted these criteria "with apparent approval" in *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244–45 n. 5, 92 S.Ct. 898, 905–06 n. 5, 31 L.Ed.2d 170 (1972) [hereinafter *S & H* ] Courts that have examined *S & H* in light of the Policy Statement have concluded that the most that can be reasonably inferred is that "the Supreme Court thus put its stamp of approval on the Commission's evolving use of a consumer unfairness doctrine not moored in the traditional rationales of anticompetitiveness or deception." *A.F.S.A.*, 767 F.2d at 971 (footnote omitted). Indeed, the quoted 1964 standards were merely

used to exemplify the Supreme Court's statement that "the Federal Trade Commission ... like a court of equity, considers public values beyond simply those enshrined in the letter or encompassed in the spirit of the antitrust laws." *S & H*, 405 U.S. at 244, 92 S.Ct. at 905 (footnote omitted).

The Policy Statement went on to state that, since the 1964 standards, "the Commission has continued to refine the standard of unfairness in its cases and rules, and it has now reached a more detailed sense of both the definition and the limits of these criteria." [4] Policy Statement at 36. The Commission opined that *consumer injury* is the primary focus of the FTC Act and the most important of the *S & H* criteria. By itself, consumer injury could warrant a finding of unfairness. Nonetheless, not "every consumer injury is legally 'unfair.'" *Id.* at 36. To warrant a finding of unfairness, "the injury must satisfy three tests. It must be substantial; it must not be outweighed by any countervailing benefits to consumers or competition that the practice produces; and it must be an injury that consumers themselves could not reasonably have avoided." *Id.*

### Consumer Injury as Refined in 1980

Regarding *substantial injury,* the Commission stated that it "is not concerned with trivial or merely speculative harms." *Id.* (footnote omitted). "In most cases a substantial injury involves monetary harm ... [u]nwarranted health and safety risks may also support a finding of unfairness." *Id.* On the other hand, "[e]motional impact and other more subjective types of harm ... will not ordinarily make a practice unfair." *Id.*

The *countervailing benefits test* recognizes that "most business practices entail a balancing of costs and benefits to the consumer." *A.F.S.A.,* 767 F.2d at 975. Since many trade

---

4. Some court and commentators opine that the Policy Statement, although establishing an abstract definition of unfairness focusing on unjustified consumer injury, "does little toward delineating the specific 'kinds' of practices or consumer injuries which it encompasses." *A.F.S.A.* at 971 (citing authorities).

practices provide a mixed bag of costs and benefits, the Commission "will not find that a practice unfairly injures consumers unless it is injurious in its net effect." Policy Statement at 37. This analysis includes the costs to "society in general in the form of increased paperwork, increased regulatory burdens on the flow of information, reduced incentives to innovation and capital formation, and similar matters." *Id.*

The guiding principle of the *not reasonably avoidable injury test* is that

[n]ormally we expect the marketplace to be self-correcting, and we rely on consumer choice—the ability of individual consumers to make their own private purchasing decisions without regulatory intervention—to govern the market. We anticipate that consumers will survey the available alternatives, choose those that are most desirable, and avoid those that are inadequate or unsatisfactory.

*Id.* Corrective action is viewed as necessary only when consumers are prevented "from effectively making their own decisions." *Id.* The purpose of such action is "to halt some form of seller behavior that unreasonably creates or takes advantage of an obstacle to the free exercise of consumer decision making. *Id.*

**Violation of Public Policy as Refined in 1980**

Regarding the second of the *S & H* standards, violation of public policy, the Commission stated that, despite its listing as a separate consideration, "it is used most frequently by the Commission as a means of providing additional evidence on the degree of consumer injury caused by the specific practices." *Id.* at 38. Nonetheless, since evidence of consumer injury is not clear cut in all cases, the consideration permits the Commission to look to statutes or other sources of public policy to affirm that a practice is unfair. *Id.* at 38–39. A public policy alone can support a Commission action when "the policy is so clear that it will entirely determine the question of consumer injury, so there is little need for a separate analysis by the Commission." *Id.* at 39. Because the legislature or

court has already determined that such injury exists, an independent basis need not be proven. *Id.*

The Policy Statement warns:

To the extent that the Commission relies heavily on public policy to support a finding of unfairness, the policy should be clear and well-established. In other words, the policy should be declared or embodied in formal sources such as statutes, judicial decisions, or the Constitution as interpreted by the courts, rather than being ascertained from a general sense of the national values. The policy should likewise be one that is widely shared, and not the isolated decision of a single state or single court. If these two tests are not met the policy cannot be considered as an 'established' public policy for purposes of the S & H criterion. The Commission would then act only on the basis of convincing independent evidence that the practice was distorting the operation of the market and thereby causing unjustified consumer injury.

*Id.* at 40.

**Unethical or Unscrupulous Conduct as Refined in 1980**

The third test was apparently designed to permit the Commission "to reach conduct that violates generally recognized standards of business ethics." *Id.* The Commission concluded that this "test has proven, however, to be duplicative" because "[c]onduct that is truly unethical or unscrupulous will almost always injure consumers or violate public policy as well." *Id.* The Commission further conceded that it "never relied on" this test and "will act in the future only on the basis of the first two." *Id.*

**B**

**Are the 1980 Refined Standards Repugnant to a Private Right of Action Under the CPA?**

■ Amicus urges this Court not to adopt the FTC's 1980 refinements to the third prong of the 1964 test (whether the practice causes substantial injury to consumers), and, there-

fore, to ignore the FTC's refinement of that standard, its approval by Congress, and its adoption by the federal judiciary. Amicus asserts that "[t]hese refinements may conflict ... with both §§ 13–302 and 13–408 of the [CPA]," but it provides absolutely no support for that assertion, although it is "the state agency charged with the responsibility for enforcing the [CPA]."

We are persuaded by the FTC's Policy Statement, the FTC's actual practice and rulings, Congressional action, and the relevant federal case law that the 1980 refinements to the FTC's test for unfair trade practices is the appropriate test for Maryland. Indeed, our research has not uncovered any jurisdiction that continues to follow the superceded 1964 standards. Certainly, our ruling is supported by CPA § 13–105 requiring that this Court give due consideration to the FTC and federal courts. In addition, the 1980 Policy Statement represents the better reasoned view.[5]

Contrary to amicus's brief, the first prong of the three-part test to determine consumer injury (whether the injury is substantial) *was* included in the 1964 test. Moreover, we are not persuaded that it contravenes CPA § 13–408. That section specifically requires that the prohibited trade practice result in injury or loss to the consumer. The substantial injury requirement is designed to weed out "trivial or merely speculative harms." Policy Statement at 36. In addition, CPA § 13–408(c) grants the court authority to award attorney's fees for an action that is "brought in bad faith or is of a frivolous nature."

In our view the General Assembly's policy against private actions for frivolous injury is harmonious with the FTC policy against actions for trivial injury. Indeed, the dictionary definitions of "frivolous" and "trivial" are nearly identical: frivolous is defined as "of little importance" and trivial is defined as

---

5. It is important to note that this holding does not necessarily extend to public enforcement by the Division. The case *sub judice* is one of private enforcement. Application of any FTC standard to public enforcement is simply not presented by the facts of this case.

"of little worth or importance." WEBSTER'S NINTH NEW COLLE-
GIATE DICTIONARY 494, 1264 (1984). We are cognizant that the
FTC policy speaks only to enforcement by the FTC because
the FTC Act provides no avenue for private actions. Al-
though a private citizen may be willing to expend great
resources to remedy a trivial or frivolous injury, a government
agency with limited sources might be forced to forego prose-
cuting that particular injury. The CPA, however, clearly
intends to prevent such private actions.

Amicus further suggests that the "substantial injury" re-
quirement is inconsistent with CPA § 13–302, presumably
because that section does not require actual injury. This is
not pertinent to the case *sub judice* because CPA § 13–302
"pertain[s] to enforcement action by the Attorney General and
the Division of Consumer Protection...." *CitaraManis*, 328
Md. at 153, 613 A.2d 964 (quoting Comment, *Maryland's
Consumer Protection Act: A Private Cause of Action for
Unfair or Deceptive Trade Practices*, 38 MD.L.REV. 733, 739 n.
50 (1979). This case involves only a private right of action.[6]

The second prong of the 1980 test, whether the injury is
outweighed by a countervailing benefit, is consistent with the
CPA's purpose of protecting "consumers across the State."
CPA § 13–102(b). To be sure, preventing an act that may
appear to be unfair to one consumer but that actually benefits
Maryland consumers at large was not contemplated by the
drafters of the CPA. A private right of enforcement should
not be permitted to injure Maryland consumers across the
state.

Finally, the third prong, whether the injury could reason-
ably be avoided, is consistent with the CPA. Indeed, CPA
§ 13–102 indicates that the General Assembly intended that
the CPA would apply only to circumstances where the free
market had failed. The General Assembly believed that "al-
though the majority of business people operate with integrity

---

6. In addition, amicus's position ignores the FTC definition of substan-
tial injury, which includes the mere "risk" of an injury that is "unwar-
ranted" or "substantial." Policy Statement at 40.

and sincere regard for the consumer," CPA § 13–102(b)(2), "there has been mounting concern over the increase of deceptive practices in connection with sales of merchandise, real property, and services and the extension of credit." CPA § 13–102(a)(1). Thus, it is clear that absent a market hinderance, which is not in the majority of cases, a practice is not to be considered unfair or deceptive under the CPA.

# C
## Application of the FTC's Standards

■ All of Legg's claims of unfair trade practices may be treated together because they essentially assert the same claim: It was unfair for the Castruccios to require Legg to bear the burdens and liabilities of having the upstairs tenants' utility usage on her meter as a condition of her continued tenancy.

This claim fails under the FTC's test for *consumer injury* because Legg has not demonstrated that it was an injury that she could not have reasonably avoided. Since Legg learned of the utility situation early in her tenancy, there was a period of over three years during which she could have moved to another location. In addition, there is no evidence in the record that locating a new apartment with separate utility metering would be difficult in Anne Arundel County.

■ Legg next asserted that her claim satisfies the requirements for an unfair trade practice because the Castruccios violated a Maryland Public Policy "[t]hat all residents should have access to utility services and that the only condition that can be imposed upon the service is that a person must pay her[/his] own bill." She relies on Md.Code (1974, 1988 Repl. Vol.), § 8–211(b) and (e)(1) of the Real Property Article [hereinafter Real Prop.]; Md.Ann.Code Art. 78 § 51(c); Anne Arundel County Code, Art. 22, §§ 2–303, 2–404, and 2–501.

Article 78, § 51(b) is an important Code section not relied upon by Legg. Article 78 § 51 addresses, *inter alia*, the regulation of gas and electric service companies by the Public

Service Commission. Subsection (b)(1) states, in pertinent part:

> The Public Service Commission may not authorize . . . a gas and electric company to service any new residential multiple occupancy building on which construction begins after July 1, 1978 . . . unless the building . . . *has individual metered service, or submetering as provided for under § 54G of this article, for each occupancy unit . . . that is individually leased or owned.* . . . [Emphasis added].

Article 78, § 54G, "Installation and regulation of electric metering and submetering of apartment houses," grants the Public Service Commission the authority to

> promulgate rules, regulations, and standards under which any owner, operator, or manager of an *apartment house* . . ., which is not individually metered for gas or electric for each dwelling unit, . . . may install submetering equipment for each individual unit for the purpose of fairly allocating the cost of each unit's gas or electric consumption. If the owner, operator, or manager of an apartment house . . . installs submetering equipment in accordance with this section in order to provide bulk metered service, the owner, operator or manager may not impose upon any unit any utility cost except charges authorized by the Public Service Commission and actually imposed upon the owner, operator, or manager, which charges have been allocated among the units in proportion to the actual usage of cubic feet or kilowatt hour by the unit. . . .

Article 78, § 54G(c) (emphasis added).

Although § 54G addresses allocation of gas and electric usage, it is inapplicable to the case *sub judice* because it defines an "[a]partment house" as "a building or buildings containing more than two dwelling units. . . ." Art. 78, § 54G(a)(2). Since the house at 1139 Discus Mill Road had only two dwelling units, the policy of § 54G is not intended to apply to the instant circumstances. In any event, nothing in § 54G prevents the landlord or owner from having a tenant place the bulk meter account in his/her own name.

Section 51(b), which is not limited to an "apartment house," manifests a policy against shared metering situations; it does not, however, apply to buildings constructed before 1978, presumably because the General Assembly did not want to place the burden of retroactive application on landlords and owners. Section 51(b) was enacted in 1977 MD.LAWS, Ch. 561 (House Bill 1493). A direct implication from this policy is that multiple occupancy buildings constructed prior to July 1, 1978 do not need to have individual metering, and, therefore, use of a single meter for more than one unit is not *per se* unfair.[7]

Article 78 is silent as to the issue of who can be made responsible for the single meter. Therefore, a public policy is not manifested on that issue.[8]

▮ Legg also asserts that the requisite public policy is manifested in REAL PROP. § 8–211(b), which states that "[i]t is the public policy of Maryland that meaningful sanctions be imposed upon those who allow dangerous conditions and defects to exist in leased premises...." Subsection (e) provides examples of conditions and defects that a landlord is responsible for curing, and makes clear that the defect or condition does not actually have to actually exist, as long as the defect will be created if prompt action is not taken. "Lack of heat, of light, electricity, or of hot or cold running water, except where the tenant is responsible for payment of the utilities and the lack thereof is the direct result of the tenant's failure to pay the charges...." are examples of impermissible conditions and defects. REAL PROP. § 8–211(e)(1).

---

7. The record extract does not reveal when the residence at 1139 Discus Mill road was constructed. It is apparent, however, from the pleadings that the residence was constructed prior to 1978.

8. Interestingly, in *Golt*, 308 Md. at 5, 517 A.2d 328, a similar utility scheme existed, indicating that this situation may not be rare. The facts in *Golt* were that "[t]he gas and electric bill for the entire building was to be paid by the tenant on the second floor of the building, and the tenant living in the advertised apartment was to reimburse the second floor tenant for ¼ of the monthly bill." *Id.*

On the same point, Legg refers us to ANNE ARUNDEL COUNTY CODE § 2–213, which provides:

Except when the landlord would be entitled to possession of the premises in accordance with law, a temporary interruption necessary while actual repairs or alterations are in process or during temporary emergencies when discontinuance of service is approved by the Health Officer, an owner, operator, or occupant may not cause a service, facility, equipment, or utility that is required by this article to be removed from, shut off from, or discontinued for an occupied dwelling or dwelling unit let or occupied by that owner, or occupant.

Legg asserts that the foregoing ANNE ARUNDEL COUNTY CODE and REAL PROP. sections manifest a policy that the Castruccios, as landlords, are responsible to pay the upstairs tenants' utility bills to correct the problem of Legg having her utility service threatened because of other tenants' failure to pay their respective share. REAL PROP. § 8–211 is ambiguous as to whether the exception for a tenant's failure to pay the utility bill includes a second tenant's failure to pay his or her respective share.[9] Nonetheless, the utility service was never actually turned off while Legg lived at 1139 Discus Mill Road, despite apparent threats to do so. Thus, even the threat of her utility service being cut off while at 1139 Discus Mill Road has ended.

Moreover, the policy of REAL PROP. § 8–211 does not extend to Legg's new residence. Although the record is clear that BG & E has no intention of forgiving Legg's liability and that her continued utility service is threatened, the language of § 8–211 limits its application to the leased premises.

### III

Legg's final argument is that the trial judge erred in not finding that the Castruccios breached the covenant of quiet

---

9. The trial judge found that Legg, as well as the upstairs tenants, were not making utility payments.

enjoyment implied into her lease. She asserts that the Castruccios, by leasing a separate apartment that was connected to her electric meter, put the upstairs apartment to a use that interfered with the use of her apartment. "She was forced to surrender control of her finances and her continued electrical service to complete strangers without any prior discussion or forewarning." In the same vein, she argues that the upstairs tenants' failure to reimburse her for their utility usage was also a breach of the covenant of quiet enjoyment. Moreover, the Castruccios had the power to correct or terminate the upstairs tenants' conduct by paying the upstairs tenants' share of the utility bills, metering each unit separately, increasing the upstairs tenants' rent by the amount of the utility bill each month (especially since the tenancy was only month-to-month), or evicting them. This power, she argues, arises from the oral month-to-month lease agreement made between the upstairs tenants and the Castruccios which included an agreement that the upstairs tenants would split the utility bills with Legg.

## A

■ Section 2–117 of the Real Property Article provides that "unless the lease provides otherwise, there is an implied covenant by the lessor that the lessee shall quietly enjoy the land." REAL PROP. § 2–117; *Bocchini v. Gorn Mgt. Co.*, 69 Md.App. 1, 515 A.2d 1179 (1986).

A determination of whether the covenant of quiet enjoyment has been breached is closely related to the doctrines of actual eviction and constructive eviction. *See generally* RICHARD R. POWELL & PATRICK R. ROHAN, POWELL ON PROPERTY 16B–27 through 16B–34 (1993) [hereinafter POWELL ON PROPERTY] (discussing the doctrine of constructive eviction and covenant of quiet enjoyment). It is well established that a landlord's actual dispossession of a tenant breaches the covenant of quiet enjoyment. Interferences by the landlord that substantially interfere with the tenant's enjoyment of the premises and cause the tenant to vacate are also actionable as "constructive evictions." *Id.; Stevan v. Brown*, 54 Md.App. 235, 240–41, 458 A.2d 466 (1983). The scope or magnitude of an interference

by the landlord that rises to the level of constructive eviction has varied over the course of the development of the doctrine, and has "generally moved in the direction of an increase in the landlord's responsibilities." POWELL ON REAL PROPERTY at 16B–27.

*Stevan* is the only case in Maryland that speaks to the relationship between the covenant of quiet enjoyment and constructive eviction, and although that opinion is not crystal clear, a review of its pertinent holdings is an essential starting point.[10] The relevant facts were these. In 1963, tenants (a law firm) leased offices from landlords. On July 31, 1973, a new lease was executed for the same premises for a five-year term beginning November 1, 1973 (the "1973 lease"). The 1973 lease provided for an automatic five-year renewal term from November 1, 1978 to October 31, 1983, "unless the Tenant shall give the Landlord notice in writing of its intention not to renew the lease on or before April 30, 1978, and no later." *Stevan,* 54 Md.App. at 237, 458 A.2d 466.

In April 1977, tenants sued the landlords claiming that the lease had been substantially breached and was terminated because the landlords failed to provide proper elevator service, janitorial service, heat, hot water, and other promised services. Tenants asked to be permitted to remain in the premises for six months or until they could locate new quarters. In October 1978, at the end of the 1973 lease term, tenants moved to a new location.

The tenants' fundamental position on appeal was that the trial court erred in not finding that they were constructively evicted from the leased premises. This Court delineated the doctrine of constructive eviction: "[A] constructive eviction occurs when the acts of a landlord cause serious or substantial interference with the tenant['s] enjoyment of the property

---

10. In *Bocchini,* this Court did not have to review the relationship between these two doctrines because the tenant vacated the apartment, allegedly as a direct result of the circumstances constituting a breach of the covenant of quiet enjoyment. *Bocchini,* 69 Md.App. at 12 n. 7, 69 Md.App. 1.

which results in the tenant vacating the premises." *Id.* at 240, 458 A.2d 466. The landlord must act with the intent and effect of depriving the tenant of his/her use and enjoyment. Such intent may be "inferred from the nature and impact of the acts." *Id.* A tenant who waits an unreasonable amount of time before vacating the premises may waive his/her right to a claim of constructive eviction, and, generally, a tenant cannot claim constructive eviction until the tenant actually vacates. *Id.* at 241, 458 A.2d 466.

In light of these principles, we ruled that although the tenants' 1973 lease did not end until October 1978, and they filed suit against the landlord in April 1977, because the tenants did not vacate until October 1978, the end of the 1973 lease term, the theory of constructive eviction offered no opportunity for relief under that lease. *Id.* The Court's further analysis regarding the renewal term is not pertinent to the instant analysis.

In juxtaposition to the doctrine of constructive eviction, the *Stevan* Court delineated the theory of breach of the covenant of quiet enjoyment that had been raised but not addressed below. We noted that if the tenants' complaints did not "support a claim of constructive eviction, they may constitute a breach of the covenant of quiet enjoyment." *Id.* at 247, 458 A.2d 466. We also adopted the Massachusetts Supreme Judicial Court's view on the matter, (*Charles E. Burt, Inc. v. Seven Grand Corp.*, 340 Mass. 124, 163 N.E.2d 4, 6, 8 (1959)), which defined the scope or magnitude of interference necessary for a breach of the covenant of quiet enjoyment as well as the relationship between the covenant of quiet enjoyment and the doctrine of constructive eviction. *See Stevan,* 54 Md.App. at 247–48, 458 A.2d 466.

A breach of the covenant of quiet enjoyment was defined as failure to provide something that "goes to the essence of what the landlord is to provide." *Id.* at 247, 458 A.2d 466. We quoted at length from *Seven Grand Corp.:*

Where tenants lease space on an upper floor of an urban building, as here, to conduct business enterprises, it is

> unrealistic to say that furnishing light, heat (in our climate), power, and elevator service does not go to the essence of what the landlord is to provide, to substantially the same extent as the term for [years] in the space itself. Failure to furnish such services, at least if serious in extent and not excusable, deprives the lessee of a vital part of what the landlord knows the lessee must have in order to carry on his business. Such a failure constitutes a breach of the covenant of quiet enjoyment ... and "enables the lessee to recover the damages caused to him thereby...."

*Stevan,* 54 Md.App. at 247–48, 458 A.2d 466 (quoting *Seven Grand Corp.,* 163 N.E.2d at 4, 8). In such a case "the landlord will be liable to the tenant for 'the difference between the value of what [a tenant] should have received and the fair value of what it has in fact received.'" *Id.* (quoting *Seven Grand Corp.,* 163 N.E.2d at 8).

The *Stevan* definition of a breach of the covenant of quiet enjoyment was restated in *Q C Corp. v. Maryland Port Admin.,* 68 Md.App. 181, 198, 510 A.2d 1101, *rev'd in part on other grounds,* 310 Md. 379, 529 A.2d 829 (1986). In so doing, this Court added that the covenant "'insulates the tenant against acts or omissions on the part of the landlord ..., which interfere with the tenant's right to the use and enjoyment of the premises for the contemplated purposes.'" *Id.* at 198, 510 A.2d 1101 (quoting 3 G. THOMPSON, THOMPSON ON REAL PROPERTY § 1130, at 456 (1980)); *see also Bocchini,* 69 Md. App. at 6, 515 A.2d 1179 (relying on the THOMPSON definition). The THOMPSON definition quoted in *Q C Corp.* is essentially the definition stated in the RESTATEMENT (Second) OF PROPERTY, § 6.1 (1977) [hereinafter RESTATEMENT], which focuses on "interference with a permissible use of the leased property...." It is important to note that the Restatement diverged from the then-extant weight of judicial authority by emphasizing "whether the interference with a permissible use is more than insignificant, whereas the cases generally use language that calls for the interference being substantial." RESTATEMENT, *supra,* Reporter's Note 1. This refinement was the result of two rules adopted by the RESTATEMENT. First, it permits

remedies other than total non-payment of rent for partial eviction (comment h), and second, it permits tenants to claim interference with a permissible use without vacating the premises (comment e). RESTATEMENT, *supra*, Reporter's Note 1.

The point addressed in RESTATEMENT, *supra*, cmt. e, was also addressed in *Stevan.* The tenants in *Stevan* could not bring a claim for constructive eviction during the 1973 lease because they did not vacate until the 1973 lease term expired; the Court stated, however, that such a remedy existed under the covenant of quiet enjoyment. The approach adopted in *Stevan* was to permit an action for damages under the covenant of quiet enjoyment without vacation of the premises by the tenant. Thus, "the landlord will be liable to the tenant for 'the difference between the value of what [a tenant] should have received and the fair value of what it has in fact received.'" *Id.* (quoting *Seven Grand Corp.,* 163 N.E.2d at 8).

Permitting a tenant to file a claim for damages under the covenant of quiet enjoyment without vacating the premises accomplishes the task of freeing the covenant from the closely related doctrine of constructive eviction, which by definition requires an interference substantial enough to warrant vacation. *See Stevan,* 54 Md.App. at 237, 458 A.2d 466. Although this rule does not appear to be the majority rule, it was adopted by the RESTATEMENT and is strongly endorsed by commentators and several jurisdictions. POWELL ON PROPERTY 16B–37 states:

> A requirement of eviction is perfectly proper when the tenant seeks to terminate the lease and avoid further responsibility for rent, but seems unnecessary when the tenant seeks to affirm. The preferable view, expressed by both the RESTATEMENT (Second) and the UNIFORM RESIDENTIAL LANDLORD AND TENANT ACT is that the tenant can affirm the lease when the landlord breaches the covenant of quiet enjoyment and recover damages. [Footnotes omitted.]

*See also* 49 AM.JUR.2d, *Landlord and Tenant* § 333 (1970) (citing cases adopting this rule and stating that a possible rationale for it is that "the rule requiring an eviction is limited

to cases where the tenant is asserting that he is not liable for the payment of the stipulated rental, and that the rule has no application to actions where the tenant asserts a claim for damages for a breach of the covenant of quiet enjoyment even where such a claim for damages is asserted by way of setoff, recoupment, or counterclaim in an action for rent"); RESTATEMENT, *supra*, cmt. h and Reporter's Note 6.[11]

Our more recent opinions have defined the scope of the covenant of quiet enjoyment as it relates to interferences caused by other tenants. We have held that the conduct of another tenant can constitute a breach of the covenant where the landlord has legal authority to control that conduct. *Bocchini*, 69 Md.App. at 10, 515 A.2d 1179. In *Bocchini*, we adopted the rule explicated in the RESTATEMENT, *supra*, which states in pertinent part that, absent some contrary agreement, "there is a breach of the landlord's obligations if, during the period the tenant is entitled to possession of the leased property, *the landlord, or someone whose conduct is attributable to him*, interferes with a permissible use of the leased property by the tenant." *Bocchini*, 69 Md.App. at 10, 515 A.2d 1179 (emphasis added) (quoting RESTATEMENT, *supra*, § 6.1). For example, we quoted RESTATEMENT, supra, illus. 11:

"L leases an apartment to T. L leases another apartment in the same building to A. Under the terms of each lease, L reserves the right to terminate the lease if a tenant persists in making noises disturbing to other tenants after being

---

11. Permitting a claim for damages without requiring that the tenant actually vacate the leased premises is consistent with the well-established policy that a tenant can bring a claim for equitable relief, such as an injunction, without the necessity of vacating the premises. *E.g., Baltimore Butchers Abattoir & Live Stock Co., Inc. v. Union Rendering Co.*, 179 Md. 117, 121, 17 A.2d 130 (1941) (stating that "[i]n Maryland it has been definitely decided that it is within the sphere of equity jurisdiction under appropriate circumstances to protect a lessee's interest by enjoining others from interfering with him in the enjoyment of the premises when an action at law would not afford him an adequate remedy, or when he would otherwise be required to resort to actions in ejectment and in tort to obtain redress for the wrongs committed"). In addition, expiration of the lease does not *per se* prevent a cause of action for damages. *Id.*

requested to stop the disturbing noise(s). T complains to L about disturbing noises of A and L refuses to do anything. The noises of A are attributable to L for the purposes of applying the rule of this section."

## B

The first determination we must make is whether Legg has proved conduct on the part of the Castruccios that is repugnant to the covenant of quiet enjoyment. The first instance of alleged improper conduct occurred when the Castruccios leased the upstairs apartment in a condition that required all electric usage for that apartment to be drawn through Legg's meter, which she had established in an account solely in her name, as required by the terms of her oral lease. Legg contends that the rental of the upstairs apartment essentially forced her to accept primary liability for the unrestricted utility use of another tenant.

Our research has uncovered no authority that addresses similar factual circumstances. In our opinion, a landlord's burdening one tenant with liability for other tenants' utility usage, when the liable tenant has no prior knowledge of that burden and does not consent to it, is a breach of the covenant of quiet enjoyment because it severely interferes with the liable tenant's use of his/her premises. Legg could not continue to receive utility service without also incurring the liability of having to pay for the utility usage of the upstairs tenants. Incurring liability for other tenants' utility usage is as severe in degree of magnitude as a landlord's failure to provide promised heat or electricity, or failure to quiet noisy neighbors.[12]

Although the Castruccios breached the covenant of quiet enjoyment by leasing an apartment that would force Legg to

---

12. Appellees and the trial court emphasized that Legg's utilities were never actually cut off, and that she was in arrears as to a portion of her utility usage as well. This argument, however, ignores the fact that regardless of the continued utility service, Legg's personal liability increased every day for the utility usage of another tenant.

incur personal liability, she clearly waived recourse for that breach. The record indicates that she agreed with the upstairs tenants to split the utility bills and that everything went fine until the upstairs tenants stopped paying, roughly two years later.

Legg also asserts that the covenant of quiet enjoyment obligated the Castruccios to evict the upstairs tenants when they stopped paying their share of the utility bills. Our understanding of this argument is that it is separate from her contention regarding her primary liability for the utility bills. Legg is not asserting that she is not primarily liable for those bills; but, rather, she asserts that once she told the Castruccios that the upstairs tenants were not paying their half of the utility bills, the Castruccios were obligated to act on that complaint in a reasonable manner and possibly evict the upstairs tenants, who were on a month-to-month lease.

The trial judge dismissed this argument because,

[t]he Castruccios did not have a power of lease or contractual obligation with [the upstairs tenants] for the payment of the [utility] bill on Legg's account. [The upstairs tenants'] failure to pay Legg could not form the basis of an eviction action by the Castruccios against [the upstairs tenants]. . . .

Further, an attempt to end [the upstairs tenants'] tenancy may have resulted in a complaint being filed against the Castruccios because [the upstairs tenants] had never promised to pay the Castruccios, only to pay Legg. . . .

█ The trial court's ruling that the Castruccios did not have legal authority to evict the upstairs tenants based on their failure to pay their share of the utility bill is clearly erroneous. The undisputed facts of this case are that the Castruccios told the upstairs tenants that they would have to split the utilities with Legg. Indeed, the Castruccios' rent ledger states, under the name "Vincent Harcourt," "must split electric & heat." In addition, Sadie Castruccio signed a letter she apparently wrote that confirmed that Harcourt and Papilon will be responsible to Legg for one-half of the utility bills. Thus, it is evident that a term of the upstairs tenants' lease

with the Castruccios was that they would pay one-half of the utility bills to Legg. The trial judge's conclusion that the Castruccios had no agreement with the upstairs tenants for payment of the utility bills is incorrect.

Without such an agreement, the Castruccios would need to contend that they rented Harcourt and Papilon the apartment and that they told them that Legg was responsible for the utilities for the entire house and that they could stay as long as they like without paying the utility bills or until Legg moves and disconnects service to the entire household. Certainly such a situation could be a breach of the covenant of quiet enjoyment, grounds for a constructive eviction, and a deceptive and unfair trade practice.

█ The record is very vague regarding if and when Legg complained to the Castruccios regarding the upstairs tenants' failure to pay for their share of the utilities. Legg testified that she asked Sadie Castruccio to install separate utility meters. The timing and content of this complaint is crucial because Legg is not entitled to any damages for unpaid utility usage prior to such a complaint.[13] Moreover, the Castruccios were entitled to reasonably sufficient time to take appropriate action. On this point the RESTATEMENT cmt. e, *supra*, opines that a landlord should "promptly" alleviate the interference, which in the case of a conduct by another tenant, means "as soon as possible." *Id.; see also, e.g., Pague v. Petroleum Prods. Inc.*, 77 Wash.2d 219, 461 P.2d 317 (1969).

In addition, we are unable to ascertain from the current record whether Legg waived any right to recover for this breach of the covenant of quiet enjoyment. The prevailing view is that "[t]he failure on the part of a tenant to request that an interference cease while the interference is continuing waives any right on the part of the tenant to object to that interference." RESTATEMENT, *supra*, cmt. g.

---

13. If Legg were to rely on her vacation of the apartment as a constructive eviction, she would not be entitled to any damages because the injury was already incurred by the time she vacated.

Since the trial court did not make the necessary findings regarding when and if Legg complained to the Castruccios that the upstairs tenants were not paying their share of the utility bills, this case must be remanded for further proceedings. If Legg preserved her right to damages based on the Castruccios' breach of the covenant of quiet enjoyment, damages should be measured as one-half of the utility charges incurred. Legg's legal liability owed to BG & E is an "actual damage" even though payment has not yet been made to BG & E. *See Golt,* 308 Md. at 15, 517 A.2d 328 (landlords' legal liability to pay second-floor tenant for gas and electric bill and city for water and sewage service was "actual damage" even though landlord had "not yet made any payment" on those bills).

**JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY VACATED. CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**COSTS TO BE PAID ONE–HALF BY APPELLANT AND ONE–HALF BY APPELLEES.**