706 A.2d 102

**CONSUMER PROTECTION DIVISION**

v.

**LUSKIN'S, INC.**

**No. 352, Sept. Term, 1997.**

Court of Special Appeals of Maryland.

Feb. 26, 1998.

2

4

John Nethercut, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. and Rebecca Bowman, Asst. Atty. Gen., on the brief), Baltimore, for appellant.

Thomas M. Wood, IV (Neuberger, Quinn, Gielen, Rubin & Gibber, P.A., on the brief), Baltimore, for appellee.

Argued before HARRELL, SALMON and EYLER, JJ.

**6**

SALMON, Judge.

In the summer of 1992, Luskin's, Inc. (Luskin's) advertised "FREE AIRFARE FOR TWO" to Florida, the Bahamas, or Hawaii for customers who purchased at least $200 of goods from its stores (hereinafter referred to as "the First Ad"). On September 28, 1992, the Consumer Protection Division of the Office of the Attorney General (the Division) filed an administrative enforcement action against Luskin's, charging that the First Ad violated sections 13–303 and 13–305 of Maryland's Consumer Protection Act (the CPA), Md.Code (1974, 1990 Repl.Vol.), §§ 13–101 to 13–501, Com. Law II Article.[1] After a two-day administrative hearing that took place on November 13 and December 8, 1992, the administrative law judge (ALJ) issued her proposed decision, to which the parties filed exceptions. The Agency (the Division acting as a quasi-judicial entity), after a hearing, issued a Final Decision and Order on September 21, 1993. The Agency confirmed the ALJ's conclusion that Luskin's First Ad contained misleading representations and omissions of material facts as defined in CPA section 13–301(1), (3), (9), and prohibited by section 13–303, and involved an unlawful prize promotion under section 13–305. Luskin's then filed, in the Circuit Court for Harford County, an appeal from the Agency's Final Decision and Order.

While the administrative action was being prosecuted, a separate but parallel declaratory judgment action was proceeding in the Circuit Court for Harford County. Luskin's filed a complaint for declaratory judgment approximately two weeks before the Division initiated its enforcement action. Luskin's requested that the circuit court declare that its proposed second advertisement (hereinafter referred to as "the Second Ad"), which was a modified version of the First Ad, did not violate section 13–305 of the CPA. Ultimately, the circuit court declared that the Second Ad did not violate the CPA, but the Division appealed that judgment. We held that the circuit court abused its discretion in granting declaratory

---

1. All subsequent citations to the Maryland Code are to the Commercial Law Article, Volume II.

relief for Luskin's because the Division's enforcement action against Luskin's was underway by the time the trial judge made his ruling in the declaratory judgment suit. *See Consumer Protection Div. v. Luskin's, Inc.*, 100 Md.App. 104, 112, 640 A.2d 217 (1994), *aff'd,* 338 Md. 188, 657 A.2d 788 (1995). We concluded that the pending enforcement action against the First Ad would resolve the same legal issue raised in Luskin's suit regarding the Second Ad. *Id.* We also held that, even though the declaratory judgment suit was filed before the administrative enforcement action, under the doctrine of primary jurisdiction, the circuit court should have deferred to agency expertise. *Id.* at 114–15, 640 A.2d 217.

After we issued our decision, Luskin's appeal from the Division's enforcement action proceeded. On December 16, 1996, the circuit court reversed the Agency's Final Decision and vacated the Agency's Final Order. The Division noted a timely appeal and presents the following questions for our review, which we have rephrased for clarity:

1. Did the Agency err in concluding that Luskin's violated section 13–301 of the CPA with its free airfare advertisement?

2. Did the Agency err in concluding that Luskin's violated section 13–305 of the CPA?

3. Did the Agency err in rejecting Luskin's defenses that the Division's enforcement action was barred because it was "filed for retaliatory purpose" or, alternatively, that it was barred by the doctrine of accord and satisfaction?

4. Did the Agency err in providing injunctive and affirmative relief?

We answer all questions in the negative and reverse the judgment of the circuit court.

## FACTS

Luskin's First Ad read: [2]

---

2. Typeset is not to scale.

8

FREE* AIRFARE
FOR TWO . . .
TO FLORIDA, THE BAHAMAS OR HAWAII.
*Buy an Appliance, TV, Stereo, VCR, or any Purchase over
$200 And You'll Get a Big Gift For Two (Round Trip Airfares).

Buy Selected Items for $200–$299. (Get Airfare for 2 To/From) FLORIDA
Buy Selected Items for $300–$399. (GetAirfare for 2 To/From) BAHAMAS
Buy Selected Items over $400. (Get Airfare for 2 To/From) HAWAII
 TICKETS MUST BE USED WITHIN ONE YEAR ASK FOR DETAILS.
* Vacations Premiums Offered Through Vacation Ventures, Inc. Which is not
affiliated with Luskin's. Minimum Hotel Stay Required. See Store For De-
tails. . . . Applicable Taxes Apply. See Store For Details.

Luskin's placed this advertisement in newspapers and ran related ads on television.[3] A careful reading of the newspaper advertisements alerted customers, prior to their making purchases, to the following facts: ·(1) free airfare was contingent upon the purchase of goods of a certain dollar amount; (2) Vacation Ventures, Inc. (VVI), which was not affiliated with Luskin's, offered the "Vacation Premiums"; (3) tickets must be used within one year; (4) a minimum hotel stay was required; and (5) applicable taxes were the consumer's responsibility.

After consumers made a qualifying purchase, and took delivery of the goods, they were given a VVI brochure and airfare certificate (collectively, travel certificate). The airfare certificate was a Luskin's computer printout that stated, "This certificate entitles you to two free airline tickets from virtually anywhere in the U.S. to _____." The promotional brochure was a three-fold color pamphlet describing the vacation packages to Florida, the Bahamas, and Hawaii. The brochure also contained a page of terms and conditions and a "registration

---

**3.** There were several versions of the television ad. All versions contained some type of visual disclaimer regarding the free airfare, typically, "minimum hotel stay required." The disclaimers, in fine print at the bottom of the screen, were shown only for brief periods of time. One advertisement stated, "Min. hotel stay req. Offered through Vacation Ventures, Inc. which is not affiliated [with] or guaranteed by Luskin's. Taxes apply. Details at store." Even the fastest speed reader, however, probably could not have finished reading this statement before it disappeared from view.

request form" (the RRF). The terms and conditions listed prices, including costs for: (1) the seven- to twelve-day minimum hotel accommodations;[4] and (2) the non-refundable $15–per–person processing fee that had to accompany the RRF. Consumers were also notified by the terms and conditions that: (1) the RRF must be completed and received by VVI at least 45 days in advance of the earliest requested date of departure; (2) the RRF must include three valid choices of departure dates, each separated by 15 days; (3) the balance of the vacation cost must be paid at least 45 days prior to departure; (4) prices were not guaranteed until VVI received payment in full; (5) various fees and taxes were not included in the offer;[5] and (6) certain "black-out" dates and other travel restrictions applied.

After a consumer sent the completed RRF and processing fee to VVI, a Florida corporation that markets travel packages, VVI provided the consumer with a "confirmation of availability" (the confirmation). The confirmation set forth the cost of the vacation and disclosed downpayments and balance payments terms. In sum, the travel certificate entitled a consumer to receive "free" airfare, but only if the consumer: (1) paid VVI a $15.00 fee; (2) paid VVI for the required hotel accommodations in hotels selected by VVI, for the length of time specified by VVI, and at the rates set by VVI; and (3) paid VVI certain additional fees. Luskin's purchased 14,600 brochures from VVI. It paid between $5.35 and $5.40 for each brochure. Although the record does not indicate how many brochures were distributed, VVI received only 128 RRF's from consumers as a result of the First Ad. Of the 128, only eleven consumers actually took vacations offered through VVI.

---

4. The hotel rates ranged from $65 to $160 per night, double occupancy, taxes not included.

 The required length of stay depended on destination, and, in the case of a Hawaii vacation, also depended on the place of departure.

5. One additional fee that the consumer was required to pay was for airfare for inter-island travel on the Hawaii vacation. The brochure did not list the actual dollar cost for this travel.

The First Ad came to the Division's attention when an ad agency contacted the Division, seeking its guidance in an advertisement promotion it was creating for an auto dealership. The ad agency's proposed campaign raised concerns under the CPA similar to those raised by Luskin's First Ad. As a result, the Division initiated a review of Luskin's airfare promotion. On July 27, 1992, the Division wrote to Luskin's, advising it of the prohibitions under CPA section 13–305. It requested that Luskin's discontinue its First Ad. In response, Luskin's requested a meeting with the Division.

The Division and representatives of Luskin's met on July 30 and 31 of 1992. The Division informed Luskin's that the First Ad was not in compliance with the law and must be discontinued. Shortly after the July 31 meeting, Luskin's notified the Division that it would discontinue running the "free airfare" campaign.

## I. The Agency's Administrative Proceeding

The Division instituted its enforcement action on September 28, 1992, to

> restrain [Luskin's] from advertising and providing travel certificates to consumers in the course of selling other consumer goods and services, when the advertisements of the travel certificates misrepresent that they provide free airfare, fail to disclose the cost and terms and conditions of redeeming the certificates, and constitute an unlawful prize promotion.

The Division sought injunctive relief to prohibit Luskin's from violating CPA sections 13–303 and 13–305 and sought restitution for injured consumers.

Section 13–301 provides a non-exhaustive list of unfair or deceptive trade practices, including such practices as making a statement that has the tendency to deceive, omitting a material fact, and misrepresenting or omitting a material fact with the intent that the consumer rely on the same. Section 13–303 prohibits unfair and deceptive trade practices. Section 13–305 prohibits a person from notifying another person of

eligibility to receive something of value if receipt is conditioned on the purchase of goods or services.

During the administrative hearing, the Division called five consumer witnesses to testify. Evan Revelle, age 71, testified that he bought his washing machine at Luskin's because, in addition to the fact that he needed a new washer, he had heard about the free airfare offer on television. To him, it "sounded like a good deal." He was not given a copy of the VVI brochure until after he made his purchase, and until then, he did not know about the minimum hotel stay requirement.

Once Mr. Revelle reviewed the brochure, he made cost calculations regarding the VVI offer and compared them to vacation prices he saw listed in newspapers. He concluded, "I could safely disregard . . . Luskin's offer, because I could get the same transportation far cheaper through U.S. Air or United." He, therefore, decided not to send in the RRF. On cross-examination, it was shown that Mr. Revelle had made inaccurate cost comparisons because his calculations regarding VVI's hotel prices were not based on double occupancy.

Michael Driggs testified that he bought a television set at Luskin's because of the airfare offer he had seen advertised on television. After paying for his merchandise, he was told that Luskin's had run out of travel certificates and that he would have to return at a later date to receive one. After Mr. Driggs picked up the certificate and read its contents, he learned of the numerous qualifications to the "free" ticket offer and concluded that he "could do a whole lot better" on his own. In drawing this conclusion, he based his calculations on an estimate of $100 per day for the hotel accommodations for a Florida vacation.[6]

Robert Shifflet also made his purchase at Luskin's based on a television ad publicizing its "free" airfare. He testified that when he requested information in advance of his purchase, he

---

6. According to the VVI brochure, during the "high" season, the daily rates ranged between $88 and $105 and, during the "low" season, the daily rates ranged between $65 and $74.

was told that he would not receive the travel certificate until after he made his purchase. He initially thought that Luskin's would give him "two tickets at the store." After making the required purchase and receiving the VVI brochure, he realized that he would have to pay for hotel stays "at certain places of [VVI's] choice for a set number of days."

Dorraine Johnson testified that she had seen the Luskin's television and newspaper advertisements. Her husband wanted to go to Luskin's to buy a television, and she agreed because of the airfare offer. She asked a Luskin's salesman about any "gimmicks" involved in the offer and was told that there were none and that she would get written information about the promotion upon delivery of her merchandise. Ms. Johnson testified that she had not seen the "minimum hotel stay required" in the advertisements. After she made her purchase, she did not send in the RRF because of the hotel prices.

David McCoy made his purchase at Luskin's because he read of Luskin's airfare promotion in a newspaper ad. He decided to send in the RRF, along with the processing fee. After receiving the confirmation from VVI, he decided not to take the trip because: (1) the confirmation required him to respond with a $300 deposit within fifteen days; (2) any cancellation would result in forfeiture of all monies paid; and (3) between his requested dates of travel and all of the blackout days, he was only allowed one date for travel.

The Division introduced into evidence a Consumer Protection Division complaint form completed by Houd Zidan, a consumer who wrote to the Division to complain that he sent in the RRF and was told by VVI that he could not get any of the travel dates he requested. Moreover, according to Mr. Zidan, he could get "much more" through other travel agents he had contacted for the price charged by VVI.

Luskin's president, Cary Luskin, was the sole witness to testify on behalf of Luskin's. Mr. Luskin testified that he had researched the VVI airfare promotion to see if there had been any complaints or problems associated with similar advertising

campaigns that had run across the country. He stated that everyone he had spoken to "had no problem." He also testified that there was a sample VVI brochure on display at the stores so that a customer could read details about the offer prior to making a purchase. Moreover, when asked, "So when you're saying it's conceivable that someone could have got [sic] a lower price on the hotel room, correct, would that lower price have made up for the savings in airfare?", Mr. Luskin responded, "Not in my opinion."

Luskin's also entered into evidence a letter written by Karen Ingersoll, Ph.D. Dr. Ingersoll said:

> I first heard Luskin's add [sic] in May of '92 on TV. As I recall, the ad indicated that free airfare for 2 was available with a minimum purchase. Because I was already planning to buy an air conditioner, I went to the store in Richmond to get the details of the offer. At the store, I was given more information in the form of a written brochure and verbally by the salesperson. I asked him for the details of the offer, and he explained that the airfare would be granted if I bought a minimum stay at a choice of hotels through a travel agency. He also gave me a 3 page color brochure describing the hotels available, listing their prices, etc. I had previously priced a vacation package to travel to Disney World at $2400 through a travel agent. The airline tickets alone at that time cost $740 for 2. When I added the cost of the Vacation Ventures package, I realized it would cost only $1700, saving me $700. Therefore, I decided to purchase the air conditioner at Luskin's rather than somewhere else.

Dr. Ingersoll's letter also stated that she enjoyed her vacation through VVI and that she "never felt misled." [7]

---

7. The Division does not seem to dispute the implied premise of Dr. Ingersoll's letter, i.e., that she saw the same television ad in Richmond, Virginia, that was run in Maryland. It is to be noted that Dr. Ingersoll said in her letter that she saw the ad in "May 1992," but Cary Luskin's affidavit said that the advertisement campaign at issue started on June 1, 1992.

At the hearing before the ALJ, Luskin's contended that the Division's enforcement action was barred by an accord and satisfaction and, alternatively, that the action violated Luskin's substantive due process rights in that the company was singled out for prosecution because it exercised its constitutional right to file a declaratory judgment action. In support of these two affirmative defenses, Luskin's relied upon: (1) an affidavit of Cary Luskin; (2) testimony of Mr. Luskin; and (3) a "proffer" by Luskin's counsel as to his recollection of what transpired at the July 30 and 31, 1992, meetings between representatives of Luskin's and the Division. The Division, in rebuttal, submitted the proffer of its attorney, Rebecca Bowman, as to her recollection of the July 1992 meetings with Luskin's.

Mr. Luskin testified that he attended a meeting with the Division on July 31, 1992. Also in attendance at the meeting, among others, were Luskin's attorney, Thomas Wood, and Rebecca Bowman, representing the Division.

At the meeting, the Division took the position that Luskin's had violated section 13–305. Luskin's was told that if it continued to run the First Ad the "Division would file a lawsuit" against it. Mr. Luskin testified:

> We tried to state our case that we thought we were not in violation and we had no intention of deceiving anybody because we had 44 years of trust built up with the consumer, that we didn't want to violate that trust, that when we left the meeting as far as we were concerned if we just stopped running the ad everything was over.

After the meeting, Luskin's made arrangement to cancel the First Ad. Luskin's then submitted a proposed Second Ad, which did not say that the airfare was free. That ad, too, was deemed by the Division to be violative of the CPA. Because of the rejection of the Second Ad, Luskin's instituted the aforementioned declaratory judgment action.

The affidavit of Mr. Luskin, to a large extent, mirrored his testimony before the ALJ—with one major exception. In the affidavit, he stated that after the meeting on July 31, 1992, "I

agreed to *temporarily* voluntarily remove the advertisement from both print and television media and immediately began working on a new advertisement campaign." (Emphasis added.) In contrast, his testimony, at a minimum, at least implied that he advised the Division that he intended never to run the First Ad again.

Both counsel testified by way of proffers, which were accepted by the ALJ. Mr. Wood, counsel for Luskin's, said in his proffer:

At both of those meetings the advertisement campaign was discussed. At both of those meetings it was indicated to me that if ... Luskin's did not cease running the ad that an enforcement action would be filed in connection with the ad. On the second meeting which was on July 31, 1992, a number of discussions took place regarding the ad. If we change language this way or if we change language that way, would it be acceptable and the upshot of all of that was that we couldn't agree. There was no discussion at that meeting to the best of my knowledge regarding restitution, payment to any consumers in the state or anything of that nature. That day a decision was made not to run the ad any longer. I can't recall whether that decision was made in the presence of the attorney general or after our meeting. I tend to think it was after and I think that decision was communicated to them I think that day.

Later in the proffer, Mr. Wood said:

*We assumed, and obviously wrongfully so, that if we stopped the ad that would be the end of it. We filed a lawsuit on the proposed ad in Harford County on September 11, 1992. We actually filed a couple of things.* We filed a Motion for Interlocutory Injunction asking for affirmative relief that would rule that we could run the ad and we filed a complaint for declaratory judgment. To the best of my recollection, there were no communications between the filing of those papers and the date of the motion to dismiss the declaratory judgment, which was on September 28, 1992, between me and the attorney general regarding ad-

ministrative hearing, restitution or money to any consumers.

(Emphasis added.)

Counsel for the Division said in her proffer, *inter alia:*

At both the July 30 and 31 meetings, the Division advised Luskin's that if it did not discontinue its current free airfare advertisements, the Division would bring enforcement action against Luskin's. . At no time during either of these meetings or in subsequent discussions with Luskin's counsel did the Division make any representations as to what action it would or would not take against Luskin's if the company, in fact,. discontinued its current free airfare promotion. Shortly after the July 31, 1992, meeting, Luskin's agreed to cease running its free airfare advertisement. Luskin's, however, neither agreed that its advertisements violated section 13–305 nor that it would refrain from renewing those advertisements or some variation thereof at some point in time in the future.

The Agency's Final Decision addressed the Division's charges made against Luskin's, as well as the affirmative defenses put forth by Luskin's.[8] Based on many factual findings, the Agency, using the definitions set forth in section 13–301(1), (3), (9), held that Luskin's violated section 13–303.[9] It also concluded that Luskin's violated section 13–305. The Agency rejected all of Luskin's affirmative defenses. Following its Final Decision, the Agency issued an order providing

---

8. Based on the proposed decision submitted by the ALJ, the Commissioner of the Securities Division of the Office of the Attorney General issued the final decision for the Agency. The Chief of the Consumer Protection Division designated the Securities Commissioner as the decision-maker for the Agency.

9. Section 13–303 provides, in pertinent part:

A person may not engage in any unfair or deceptive trade practice, as defined in this subtitle or as further defined by the Division, in:
(1) The sale, lease, rental, loan, or bailment of any consumer goods, consumer realty, or consumer services;
(2) The offer for sale, lease, rental, loan, or bailment of consumer goods, consumer realty, or consumer services[.]

for injunctive and affirmative relief. We discuss below the Agency's findings of fact, its holdings, and its order.

### A. Section 13–301(1)

Section 13–301(1) reads:

Unfair or deceptive trade practices include any:

(1) False, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers[.]

The most prominently featured words of the newspaper ads were "free airfare for two." The next most prominent language listed the purchase amounts necessary to qualify for the "big gift for two." The disclaimer, which noted the minimum hotel stay requirement and VVI's involvement in the promotion, was in the smallest print. In its Final Decision, the Agency said that the "total impression" conveyed to consumers was that Luskin's " 'free airfare' promotion entitled them to free airfare to one of three destinations upon the purchase of two to four hundred dollars worth of Luskin's merchandise."

The Agency held that Luskin's advertising campaign ran afoul of the definition set forth in section 13–301(1) by misleading consumers into thinking that they would receive free airfare when, in fact, they were given a travel certificate for a vacation program that would cost a minimum of "hundreds of dollars" to redeem. The Agency also concluded that, even if consumers had carefully read the advertisement, the disclaimer was ambiguous because "[c]onsumers reasonably could assume that they had to arrange for and pay for hotel accommodations themselves," which was not permitted under any of the travel packages. In the Agency's opinion, the disclaimer did not dispel the impression that the "airfare primarily was conditioned upon the purchase of consumer goods at Luskin's and that any further condition or requirement would be secondary"; the cost of purchasing the con-

sumer goods, however, became secondary, when compared with the cost of redeeming the travel certificate.

## B. Section 13–301(3)

Section 13–301(3) defines an unfair or deceptive trade practice as including:

(3) Failure to state a material fact if the failure deceives or tends to deceive[.]

According to the Agency's factual findings, consumer witnesses had not seen a sample VVI brochure on display at Luskin's stores prior to purchase. The Agency found that Luskin's salespeople did not volunteer information about the details of the free airfare offer, and when asked, "generally did not explain the offer beyond what was represented in the advertisements." VVI supplied additional information to a consumer only after it received the non-refundable fee and the RRF from the consumer.

Because consumers were informed about the terms and conditions of the vacation packages in a piecemeal fashion after they made their purchases from Luskin's, the Agency held that Luskin's had engaged in a deceptive trade practice as defined in section 13–301(3). According to the Agency, Luskin's should have disclosed, prior to purchase, the material fact that free airfare was actually part of a vacation package offer. The Agency opined that subsequent disclosures by Luskin's and VVI did not "cure the initial misrepresentation or material omission."

## C. Section 13–301(9)

Section 13–301(9) includes in the definition of an unfair or deceptive trade practice:

(9) Deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with:

(i) The promotion or sale of any consumer goods, consumer realty, or consumer service. . . .

As previously stated, the Agency held that Luskin's misrepresented, as well as omitted material facts about, the airfare offer. According to the Agency, Luskin's "intended that consumers rely," and consumers "did rely," on its advertised free airfare offer in "deciding to shop at, and buy consumer goods and services from, Luskin's." Therefore, the Agency held that under the definition provided by section 13–301(9), Luskin's airfare promotion was unfair or deceptive.

### D. Section 13–305

The full text of section 13–305(a) and (b) is quoted in the analysis section, *infra.* In part, section 13–305 states:

(a) *Exception.*—This section does not apply to:

\* \* \*

(3) Retail promotions, not involving the offer of gifts and prizes, which offer savings on consumer goods or services including "one-cent sales", "two-for-the-price-of-one-sales", or manufacturer's "cents-off" coupons[.]

\* \* \*

(b) *Prohibition.*—A person may not notify any other person by any means, as part of an advertising scheme or plan, that the other person ... is eligible to receive anything of value if the other person is required to purchase goods....

The Agency held that section 13–305 governed Luskin's advertising promotion; that Luskin's offer of "free airfare" was something of value; that receipt of free airfare was conditioned on the purchase of goods from Luskin's; and that this type of offer violated the statute.

Moreover, the Agency held that the exception set forth in section 13–305(a)(3) for a retail promotion, not involving the offer of gifts or prizes, but which represented savings on consumer goods, was inapplicable. The Agency found that the "free airfare" was represented by Luskin's as a gift. The Agency explained that, although the consumer actually received a VVI brochure and airfare certificate rather than free airfare, this fact was "not germane to a determination of whether the promotion was prohibited" by this section because

the relevant consideration was whether the ad offered a gift, not what was actually received. Finally, in stating that the free airfare did not represent savings on consumer goods, the Agency found that the total cost of the vacation package to a consumer was "hundreds to thousands of dollars" and that comparable packages, without other purchase requirements, were available through travel agents.

### E. Luskin's Affirmative Defenses

#### 1. *Accord and Satisfaction*

Luskin's argues that the two July 1992 meetings it had with the Division resulted in an accord and satisfaction between the parties because the Division agreed not to bring charges if Luskin's pulled its First Ad, which Luskin's did.

The Agency found "no evidence of any oral or written agreement between the parties that the Division would refrain from pursuing an enforcement action if Luskin's withdrew the advertising campaign." The Agency also determined that "by Luskin's own admission, it only withdrew these advertisements temporarily." Therefore, it concluded that accord and satisfaction did not bar the Agency from bringing charges against Luskin's.

#### 2. *Retaliation and Selective Enforcement*

The Agency also rejected Luskin's claims that the Division had brought charges against it with a retaliatory purpose. The Agency agreed with the Division's claim that the filing by Luskin's for declaratory relief signaled to the Division the failure of "conciliation efforts regarding Luskin's advertising campaign." The motivation for the filing of charges, therefore, was not retaliation. The Agency also concluded that the bringing of charges did not result in selective enforcement.

### F. Final Order

In conjunction with its Final Decision, the Agency issued a Cease and Desist Order and a General Restitution Order. It granted injunctive relief, which required Luskin's: (1) to not

use advertising that had the capacity to deceive or that failed to state a material fact; (2) to ensure that its advertisements were non-deceptive by, *inter alia*, disclosing advertising statements "clearly and conspicuously," placing all statements relating to a particular matter "reasonably adjacent to each other," and not making ambiguous statements; and (3) to comply with section 13–305, and, as such, if Luskin's wished to conduct retail promotions that offered consumers monetary savings on the purchase of consumer goods and services, it could do so by offering a price reduction on two or more "functionally related" items.

The Agency's order also provided for affirmative relief for eligible consumers. An eligible consumer was one who, between June 12 and August 6, 1992, purchased merchandise from Luskin's that cost at least $200 and who stated that one reason the purchase was made at Luskin's was to obtain free airfare. Luskin's was to provide to each eligible consumer who did not use a travel certificate both the value of the promised airfare and reimbursement of funds paid to VVI in an effort to redeem the certificate. Luskin's had the option of providing the consumer with airline tickets or paying the consumer the stated cash value of the tickets. If the consumer received tickets, the tickets could be used on any date for a period of one year after the date of issue. For consumers who did redeem the certificate, Luskin's was to reimburse all payments made in order to redeem the certificate, except for payment for accommodations that had been used. The order provided for an administration process that required each eligible consumer to fill out a claims form, and required a claims administrator to review the forms to ensure that eligibility requirements were met by each individual consumer before any relief was provided to that consumer.

## II. The Circuit Court Proceeding

In addition to reversing several factual findings, the circuit court held that the Agency applied an incorrect legal standard in determining whether Luskin's violated section 13–303. Based on what it determined to be the proper legal standard,

the circuit court held that Luskin's actions did not violate section 13–303. According to the circuit court, the Agency also incorrectly interpreted section 13–305.

The circuit court also ruled that an accord and satisfaction existed between the Division and Luskin's, which the Division violated by bringing its enforcement action. Moreover, the circuit court held that the Agency acted unconstitutionally because it brought charges against Luskin's in retaliation for Luskin's exercising its statutory right to ask for declaratory relief. According to the circuit court, this retaliation resulted in selective enforcement against Luskin's because the Division did not bring similar proceedings against other companies who purportedly engaged in advertising campaigns similar to Luskin's.

The trial judge signed an order that said that the Agency's Final Decision and Order was "STRICKEN, VACATED, and deemed a NULLITY."

## ANALYSIS

### I. Standard of Review

█ Our role in reviewing the decision of an administrative agency "is precisely the same as that of the circuit court." *Department of Health and Mental Hygiene v. Shrieves*, 100 Md.App. 283, 303–04, 641 A.2d 899 (1994); *see also Baltimore Lutheran High Sch. Ass'n v. Employment Sec. Admin.*, 302 Md. 649, 662, 490 A.2d 701 (1985). We, therefore, do not evaluate the findings of fact and conclusions of law made by the circuit court. We review the administrative decision itself, *see Public Serv. Comm'n v. Baltimore Gas & Elec. Co.*, 273 Md. 357, 362, 329 A.2d 691 (1974), and not the decision of the trial court. *Maryland State Dep't of Educ. v. Shoop*, 119 Md.App. 181, 203–04, 704 A.2d 499, 510 n.6 (1998).

█ With respect to issues of law, the agency's interpretation is not ordinarily entitled to deference. *Ramsay, Scarlett & Co. v. Comptroller of the Treasury*, 302 Md. 825, 837, 490 A.2d 1296 (1985). A court may substitute its own judgment

for that of the agency when resolving questions of law. *Id.;* see also *Columbia Road Citizens' Ass'n v. Montgomery County,* 98 Md.App. 695, 698, 635 A.2d 30 (1994).

■ A court has limited power to scrutinize agency fact-finding. *See Liberty Nursing Ctr., Inc. v. Department of Health and Mental Hygiene,* 330 Md. 433, 442, 624 A.2d 941 (1993); see also *Anderson v. Department of Public Safety and Correctional Servs.,* 330 Md. 187, 212–13, 623 A.2d 198 (1993); *Shrieves,* 100 Md.App. at 296–97, 641 A.2d 899. Under the "substantial evidence" test, "if reasoning minds could reasonably reach the conclusion reached by the agency from the facts in the record, then it is based upon substantial evidence, and the court has no power to reject that conclusion." *Liberty Nursing,* 330 Md. at 443, 624 A.2d 941; see also *Board of County Comm'rs for Cecil County v. Holbrook,* 314 Md. 210, 218, 550 A.2d 664 (1988); *Bulluck v. Pelham Wood Apartments,* 283 Md. 505, 512, 390 A.2d 1119 (1978); *Snowden v. Mayor of Baltimore,* 224 Md. 443, 448, 168 A.2d 390 (1961).

■ The agency is responsible for " 'resolv[ing] conflicting evidence' " and for drawing inferences "where inconsistent inferences from the same evidence can be drawn." *Younkers v. Prince George's County,* 333 Md. 14, 19, 633 A.2d 861 (1993) (quoting *Bulluck,* 283 Md. at 512–13, 390 A.2d 1119). The agency's decision carries a "presumption of validity," *Liberty Nursing,* 330 Md. at 443, 624 A.2d 941, and is "prima facie correct," *Hoyt v. Police Comm'r of Baltimore City,* 279 Md. 74, 88, 367 A.2d 924 (1977). In applying the substantial evidence test, a reviewing " 'court should [not] substitute its judgment for the *expertise* of those persons who constitute the administrative agency from which the appeal is taken.' " *Bulluck,* 283 Md. at 513, 390 A.2d 1119 (quoting *Bernstein v. Real Estate Comm'n of Md.,* 221 Md. 221, 230, 156 A.2d 657 (1959) (alteration in original)).

On appeal, Luskin's disputes the standard we should employ when reviewing the Agency's application of law to fact. Luskin's argues that the Agency should not be accorded judicial deference. More specifically, according to Luskin's, the Divi-

sion cannot rely on the deferential standard used by federal courts when reviewing the Federal Trade Commission's (FTC) application of law to fact. Luskin's provides two reasons for its assertion: (1) the Court in *Liberty Nursing* implicitly recognized that Maryland does not adhere to the federal standard of review in situations such as this; and (2) proceedings before the FTC are not analogous to proceedings before the Agency, and the reasons why deference under the federal system is accorded to the fact-finders are inapplicable in this case.

■ Maryland courts have not relied on federal law when determining what deference should be given to an agency's application of law to fact. Maryland common law principles are well-established and here applicable. If there is room for the exercise of judgment in applying the law to the facts, the agency, not the court, must have the authority to exercise this judgment. *See Luskin's,* 338 Md. at 195, 657 A.2d 788; *Friends School v. Supervisor of Assessments,* 314 Md. 194, 200, 550 A.2d 657 (1988); *Ramsay, Scarlett,* 302 Md. at 837–38, 490 A.2d 1296. In numerous cases, Maryland courts have held that reviewing courts have the authority only to ensure that factual findings have met the substantial evidence test, and that there were no errors of law. *See, e.g., United Parcel Serv., Inc. v. People's Counsel,* 336 Md. 569, 577, 650 A.2d 226 (1994) ("A court's role is limited to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is premised upon an erroneous conclusion of law."); *Younkers,* 333 Md. at 19, 633 A.2d 861 (stating, in quoting *People's Counsel v. Maryland Marine Mfg. Co.,* 316 Md. 491, 496–97, 560 A.2d 32 (1989), that " '[T]he order of an administrative agency must be upheld on judicial review if it is not based on an error of law, and if the agency's conclusions reasonably may be based upon the facts proven. *Ad + Soil, Inc. v. County Comm'rs,* 307 Md. 307, 338–39, 513 A.2d 893 (1986).' "); *Banks v. Board of Physician Quality Assurance,* 116 Md.App. 249, 258, 695 A.2d 1260, *cert. granted,* 347 Md. 683, 702 A.2d 291 (1997) (stating that when reviewing an

agency's application of law to facts, the court "may substitute [its] own judgment for that of the agency *as to the legal issue* " (emphasis added)); *Relay Improvement Ass'n v. Sycamore Realty Co.*, 105 Md.App. 701, 713–14, 661 A.2d 182 (1995) ("A reviewing court may not overturn an agency's factual findings or its application of law to facts if the agency's decision is supported by substantial evidence."), *aff'd*, 344 Md. 57, 684 A.2d 1331 (1996). The breadth of judicial review does not allow a court to substitute its judgment for that of the agency when judgment is required in applying the law to the facts.

Furthermore, Luskin's misinterprets the holding in *Liberty Nursing*. In that case, the Court faced the question of which regulation was dispositive of the issues. *Liberty Nursing*, 330 Md. at 445–50, 624 A.2d 941. Although the Court framed its non-deferential review as encompassing the "accuracy of [the agency's] application of the law, not its fact finding," *id.* at 444, 624 A.2d 941, the Court was referring to the issue of *which* law should be applied. This determination is purely one of law, not application of law to fact. The Court was not purporting to determine whether, given an accurate choice of law, the agency's conclusion resulting from an application of that law to fact was correct.

We are persuaded that Agency judgment is required in the subject case when applying the law to the facts to determine if the First Ad contained misleading representations or omitted material facts. Agency judgment is also required in formulating appropriate injunctive and affirmative relief. As such, we will accord appropriate deference to the Agency's applications of law to fact.

■ Luskin's supporting argument—that both the ALJ and the Commissioner of the Securities Division, who was the agency designee in this case, were not well-versed in the area of consumer protection law and, therefore, their decisions were not worthy of deference—is without merit. In discussing why agency deference is due, we stated in *Shrieves*, " '[the agency is] presumed to have broad experience and expertise in

[the area].... Further, it is the [agency] to which [the legislature] has delegated administration of the [statute].'" *Shrieves*, 100 Md.App. at 300, 641 A.2d 899 (alterations in original) (quoting *Penasquitos Village, Inc. v. NLRB*, 565 F.2d 1074, 1079 (9th Cir.1977)). As part of its experience and expertise, and in furtherance of its role as defined by the legislature, an agency has the authority to effect a designation of decision-making authority. Courts have afforded deference to decisions made by decision-makers designated by an agency, without questioning individual qualifications. *See, e.g., Anderson*, 330 Md. at 205, 214–17, 623 A.2d 198 (final order issued by designee of the State Department of Personnel's Secretary of Personnel).

Moreover, in interpreting *Anderson*, the *Shrieves* Court stated that it is the agency's final decision, not the ALJ's determinations, that is reviewed by the court. *Shrieves*, 100 Md.App. at 296–97, 641 A.2d 899 (citations omitted). For the purposes of judicial review, therefore, the individual qualifications of the presiding ALJ should not be a subject of inquiry by the reviewing court.[10]

## II. Goals of the CPA

The goal of Maryland's Consumer Protection Act is to "set certain minimum statewide standards for the protection of consumers across the State." § 13–102(b)(1); *see also Morris v. Osmose Wood Preserving*, 340 Md. 519, 536–37, 667 A.2d 624 (1995); *CitaraManis v. Hallowell*, 328 Md. 142, 150, 613 A.2d 964 (1992). In enacting this legislation, the General Assembly concluded that

> it should take strong protective and preventive steps to investigate unlawful consumer practices, to assist the public in obtaining relief from these practices, and to prevent these

---

**10.** We noted in *Shrieves* that the agency is charged with considering the findings of the ALJ, and generally the *agency* should give special deference to these findings if they "'are based on witness credibility determinations.'" *Shrieves*, 100 Md.App. at 298, 641 A.2d 899 (quoting *Mattes v. United States*, 721 F.2d 1125, 1129 (7th Cir.1983)); *see also Anderson*, 330 Md. at 216, 623 A.2d 198.

practices from occurring in Maryland. It is the purpose of [the Consumer Protection Act] to accomplish these ends and thereby maintain the health and welfare of the citizens of the State.

§ 13–102(b)(3). The CPA is to be "construed and applied liberally to promote its purpose." § 13–105.

### III. Consumer Protection under the FTC Act

The CPA provides that, in interpreting its meaning, "due consideration and weight" must be given to the Federal Trade Commission's interpretations and judicial interpretations of section 5(a)(1) of the FTC Act, codified at 15 U.S.C. section 45(a)(1).[11] § 13–105.

The FTC treats "unfair" and "deceptive" trade practices separately, and requires different elements to be met prior to the Commission's taking action to prohibit these activities. *See American Fin. Servs. Ass'n v. FTC,* 767 F.2d 957, 971 n. 15 (D.C.Cir.1985).

### A. Deception

Under the "total impression" test, " '[T]he tendency of the advertising to deceive must be judged by viewing it as a whole, without emphasizing isolated words or phrases apart from their context.' " *American Home Prods. Corp. v. FTC,* 695 F.2d 681, 687 (3d Cir.1982) (alteration in original) (quoting *Beneficial Corp. v. FTC,* 542 F.2d 611, 617 (3d Cir.1976)). "The impression created by the advertising, not its literal truth or falsity, is the desideratum. . . ." *Id.* Prior to the acknowledgment of the new "reasonable person" standard in 1983, the FTC's reference point was the ordinary purchaser, in whose "intellectual acuity" the law had "very little faith." *FTC v. Sterling Drug, Inc.,* 317 F.2d 669, 674 (2d Cir.1963).

In 1983, the FTC delivered a policy statement, at the request of Congress, that refined the "deception" standard.

---

**11.** This section of the FTC Act prohibits "unfair or deceptive acts or practices in or affecting commerce."

**28**

*See* Letter from Federal Trade Commission to Representative John D. Dingell (Oct. 14, 1983), *reprinted in Deception: FTC Oversight: Hearings Before the Subcomm. on Oversight and Investigations of the House Comm. on Energy and Commerce,* 98th Cong., 2nd Sess. 183–210 (1984) [hereinafter 1983 Policy Statement with page references to *Deception: FTC Oversight* ]. The total impression test still forms the basis of the deception standard, *id.* at 184 n. 4 (discussing the "overall impression" created by a representation), but the FTC supplemented the test with additional requirements. Under the standard elucidated in 1983, deception requires not only a representation or omission that is likely to mislead, but also that: (1) the practice is likely to mislead the consumer who is *acting reasonably* in the circumstances; and (2) the representation or omission is material, that is, the consumer is likely to have chosen differently *but for* the deception. *Id.* at 184–86; *see also FTC v. Wilcox,* 926 F.Supp. 1091, 1098 (S.D.Fla.1995) (holding that a deceptive practice consists of a "material representation or omission that is likely to mislead consumers acting reasonably under the circumstances").

## B. Unfairness

The FTC standard on "unfairness" was quoted in the Supreme Court case of *FTC v. Sperry & Hutchinson Co.,* 405 U.S. 233, 244–45 n. 5, 92 S.Ct. 898, 905–06 n. 5, 31 L.Ed.2d 170 (1972) (citing Statement of Basis and Purpose of Trade Regulation Rule 408, Unfair or Deceptive Advertising and Labeling of Cigarettes in Relation to Health Hazards of Smoking, 29 Fed.Reg. 8355 (1964)). As stated in *Sperry & Hutchinson,* the criteria for unfair trade practices are that: (1) the practice causes substantial injury to consumers; (2) it violates established public policy; and (3) it is unethical or unscrupulous. *Id.* The FTC's 1980 policy statement on unfairness elaborated on the "substantial injury" requirement. *See* Letter from Federal Trade Commission to Senators Wendell H. Ford and John C. Danforth (Dec. 17, 1980), *reprinted in* H.R.Rep. No. 156, Pt. 1, 98th Cong., 1st Sess. 33–40 (1983) [hereinafter 1980 Policy Statement with page references to H.R.Rep. No. 156]. For a practice to be unfair, the resulting injury must: (1) be

substantial; (2) not be outweighed by any offsetting consumer benefit; and (3) be one that consumers could not reasonably have avoided. *See id.* at 36–37.

## IV. Luskin's Activities Under Section 13–301

### A. Maryland Case Law on Consumer Protection

Notwithstanding CPA section 13–105, consumer law in Maryland differs from its federal counterpart, as exemplified by three cases: *Golt v. Phillips,* 308 Md. 1, 517 A.2d 328 (1986); *Legg v. Castruccio,* 100 Md.App. 748, 642 A.2d 906 (1994); *State v. Cottman Transmissions Sys., Inc.,* 86 Md.App. 714, 587 A.2d 1190, *cert. denied,* 324 Md. 121, 596 A.2d 627 (1991).

In *Golt* [12] and *Cottman,* [13] the Courts did not rely on either of the FTC policy statements on deception or unfairness. Rather, the analyses in these cases aligned more closely with federal law on deception as it existed prior to 1983. Regarding section 13–301(1), which, in conjunction with section 13–303, prohibits making a statement that has a tendency to deceive consumers, the Court in *Golt* analyzed the activities of the defendant without using a "reasonable consumer" standard and without requiring that consumers were likely to have chosen differently "but for" the deception, *see Golt,* 308 Md. at 9–10, 517 A.2d 328. Both "but for" and "reasonable consumer" standards would have been applicable under corresponding post–1983 federal law on deception.

---

12. In *Golt,* a private enforcement action, a tenant was allowed to recover money damages from his landlord who leased him an unlicensed dwelling unit, which, in addition to being a violation of local laws, violated the CPA. *Golt,* 308 Md. at 9–10, 517 A.2d 328. The landlord's advertisement and rental of the apartment was an unfair and deceptive trade practice as defined in § 13–301(1), (2), (3) of the CPA. *Id.*

13. In *Cottman,* the Attorney General's Office filed charges against an automotive transmission services franchisor (Cottman) for "selling unnecessary transmission inspections to its customers by misleading them into believing that the inspections were required by Cottman to form an estimate of the repair costs." *Cottman,* 86 Md.App. at 718, 587 A.2d 1190. Cottman's activity was a deceptive trade practice as defined in § 13–301(3), (9) of the CPA. *Id.* at 725, 587 A.2d 1190.

As mentioned earlier, section 13–301(3) defines an unfair or deceptive trade practice to include omitting *a material fact* if the omission tends to deceive. In *Golt* and *Cottman*, the Courts' analyses under section 13–301(3) included a materiality component, as explicitly required by this section's terms, but not "materiality" as defined under the post–1983 FTC deception standard, i.e., the "but for" test. The *Golt* Court stated that "[a]n omission is considered material if a significant number of unsophisticated consumers *would attach importance* to the information in determining a choice of action." *Golt*, 308 Md. at 10, 517 A.2d 328 (emphasis added). According to this standard, the plaintiff has to show only that the information that had been omitted would influence individuals in making their choices, not that "but for" the deception individuals would not have made their respective purchasing decisions. Moreover, the measure by which the defendants' actions are judged is against the purchasing decisions expected of an unsophisticated consumer, not a reasonable consumer.[14]

In *Legg*, a private enforcement action, landlords failed to inform their downstairs tenant of the fact that she was responsible for the upstairs apartment's utility bill. *Legg*, 100 Md. App. at 761, 642 A.2d 906. This Court used the standard as defined in *Golt* in holding that the landlords' omission was a violation of section 13–301(3).[15] *Legg*, 100 Md.App. at 761, 642

---

**14.** Although the *Cottman* opinion initially quoted the *Golt* standard for defining an "omission," *see Cottman*, 86 Md.App. at 723, 587 A.2d 1190, the *Cottman* Court proceeded to say that "[w]e think that a material fact, in the context of the case at bar, is one which a *reasonable consumer* of transmission repairs would consider important when deciding whether to give a mechanic permission to work on his car." *Id.* at 724, 587 A.2d 1190 (emphasis added). Although we did not state our reason for substituting the *Golt* standard, we held that, under the more stringent "reasonable consumer" standard, Cottman violated the CPA. *See id.* at 725, 587 A.2d 1190. Perhaps if the Attorney General's case had been weaker, we may have strictly adhered to the *Golt* standard.

**15.** The plaintiff was not entitled to recovery, however, because the defendants' acts did not cause the plaintiff damage, an outcome that is

A.2d 906. The plaintiff asserted that, in addition to the commission of "deceptive" trade practices, the defendants "violated the CPA's prohibition against 'unfair' trade practices." *Id.* at 763, 642 A.2d 906. The plaintiff supported her claim by arguing that three specific actions that had been taken by the defendants were "unfair."

Legg was the first case in which a Maryland court split unfairness and deception into two distinct bases for action. Both the Agency in its capacity as *amicus curiae*, as well as the plaintiff, argued that the Court "should follow the approach followed by the FTC and federal courts and permit a cause of action for unfair trade practices independent from deceptive trade practices." *Id.* at 764, 642 A.2d 906. The plaintiff argued that "although the CPA does not provide an independent definition of unfair trade practice, and although the prohibited acts enumerated in the [A]ct 'primarily involve deception,' the list was never intended to be exhaustive." [16] *Id.* We agreed with the plaintiff and allowed her to argue a separate cause of action for unfairness, using federal law to define the standard.[17]

## B. Section 13–301(1)

(making a statement that has a tendency to deceive)

In applying the total impression test from federal case law, the Agency held that Luskin's First Ad was deceptive or

---

required in order to bring a successful private enforcement action. *Legg*, 100 Md.App. at 761, 642 A.2d 906.

16. *Golt* also states that § 13–301 is a "nonexclusive list of unfair and deceptive trade practices." *Golt*, 308 Md. at 8, 517 A.2d 328.

17. In the *Legg* opinion, we did not elaborate on the benefits and harms of creating an unfairness standard. Instead, in citing CPA § 13–105, the discussion focused on why this Court relied on the refined standard of unfairness illuminated in the FTC's 1980 Policy Statement, rather than the standard cited in *Sperry & Hutchinson, supra*, in determining whether the defendants' practices, as alleged by the plaintiff, were unfair under the CPA. *See Legg*, 100 Md.App. at 764–73, 642 A.2d 906.

Under the application of the more modern FTC standard in *Legg*, this Court held that the defendants had not committed practices that were unfair. *Id.* at 773, 642 A.2d 906.

misleading. The Agency stated, "While it is true, that the airfare was 'free' upon the payment of these funds and satisfaction of the terms and conditions imposed by VVI, that cannot be interpreted by a reasonable consumer as the provision of 'free airfare for two.'" Notwithstanding this statement, the Agency did not base its determination that Luskin's airfare promotion was deceptive upon the updated FTC "reasonable consumer" standard. In summarizing its rationale, the Agency stated that "[t]he ordinary consumer, whether 'reasonable' or 'unsophisticated,' is not expected to scrutinize, analyze and research an advertisement." [18] Moreover, the Agency did not use the stringent "but for" materiality standard in its analysis under section 13–301(1).

On appeal, Luskin's argues that both the FTC's 1983 Policy Statement on deception and the FTC's 1980 Policy Statement on unfairness are applicable in the instant case, and that the Agency was incorrect in failing to assess Luskin's actions in light of these policy statements.

■ The Agency is not required to apply federal law, only to give it due consideration and weight. It did so, as evidenced by its lengthy discussion in the Agency's Final Decision of federal consumer law under the FTC Act, including the 1983 modifications to the FTC's concept of deception. The Agency permissibly chose not to apply the more modern FTC standard on deception but instead applied the law as stated by the Court of Appeals in *Golt*, i.e., by implicitly using a

---

**18.** The Agency explained that

" '[t]he average purchaser has been variously characterized as not "straight thinking," subject to "impressions," uneducated, and grossly misinformed; he is influenced by prejudice and superstition; and he wishfully believes in miracles, allegedly the result of progress in science * * *. The language of the ordinary purchaser is casual and unaffected. He is not an "expert in grammatical construction" or an "educated analytical reader" and, therefore, he does not normally subject every word in the advertisement to careful study.' "
(Quoting *Sterling Drug,* 317 F.2d at 674, in turn quoting 1 Callman, *Unfair Competition and Trademarks* § 19.2(a)(1), at 341–44 (1950) and cases cited therein.)

measure less stringent than the reasonable consumer standard, and by not adding a "but for" materiality element.

 There was substantial evidence to support the Agency's holding that the total impression produced by the First Ad resulted in deception because consumers, whether unsophisticated or reasonable, were likely to have been misled. As already noted, the Division presented testimony from several consumers who had seen the First Ad and decided to make a purchase at Luskin's. These consumers anticipated that, upon making their purchases, Luskin's would give them airline tickets, not an application for a travel package that required them to stay in VVI-selected hotels and pay VVI-established prices. The limited disclaimer in the advertisement did not succeed in informing them otherwise.

 The Agency is not required to apply the FTC standard on unfairness as refined by the FTC's 1980 Policy Statement in all cases. The justification for splitting "unfair" and "deceptive" practices, as we did in *Legg*, does not exist in the subject case. In *Legg*, the plaintiff sought a separate, independent basis for recovery by alleging that the defendants had taken actions that were unfair. Here, the Division did not make an analogous charge against Luskin's.

*Legg* did not limit an existing cause of action or make it more difficult for a plaintiff to bring a successful suit under the CPA. Rather, *Legg* recognized an additional cause of action. We did not hold in *Legg* that in a case *not* concerning a separate "unfairness" claim, the Agency should nevertheless apply the unfairness standard set forth in the most recent FTC policy statement. We agree with the Division that, under *Legg*, the post–1980 FTC standards for unfair practices are inapplicable to this case.[19]

---

19. We explicitly stated in *Legg* that the holding would not necessarily extend to public enforcement actions. *Legg*, 100 Md.App. at 771 n. 5, 642 A.2d 906.

## C. Section 13–301(3)

### (omitting a material fact)

We hold that the Agency applied the correct principles of law when it analyzed Luskin's actions under section 13–301(3) by, *inter alia:* (1) addressing a materiality component as required by the statute and as interpreted in *Golt;* (2) providing, at least inferentially, a reference point for the sophistication level of consumers who would be deceived by the omission; and (3) addressing the "significant number of consumers" element as stated in *Golt.*

As noted, in analyzing Luskin's omissions under this section, the Agency applied a materiality element. It did not state explicitly, however, whether the "reasonable" or the "unsophisticated" consumer standard was applicable. The Agency did state that "[i]t is material to *any* consumer that an offer of free airfare is conditioned upon the expenditure of several hundred to thousands of dollars—more dollars, in fact, than the purchase amount at Luskin's." (Emphasis added.) We interpret this statement to mean that the Agency applied the *Golt* test, which requires that "a significant number" of consumers would attach importance to the information omitted.

There was substantial evidence to support the Agency's conclusion that the lack of disclosure about the details of the travel offer was material.[20] Several consumers testified that they had seen the free airfare offer and decided to make their purchases at Luskin's to get free airline tickets.[21] Consumers also testified that they learned of the details of the offer only after they spent their money to make their pur-

---

**20.** Luskin's stresses the fact that consumers did not return their merchandise when they learned the complete details of the travel programs. This is irrelevant. There are many reasons why consumers may have declined to return merchandise even though deception has been practiced upon them.

**21.** Whether the advertisement was the sole reason for a consumer's purchase at Luskin's is also irrelevant. It is clear that consumers made their decisions to shop at Luskin's at least in part because of the offer of free airfare.

chases.[22] Once the terms and conditions were disclosed to consumers, only a small number decided to take advantage of any of the travel packages.

### D. Section 13–301(9)

#### (intending that consumers rely)

■ Section 13–301(9) defines an unfair or deceptive trade practice as including "[d]eception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same." The Agency interpreted the language in this section to require that, for a violation to have occurred, Luskin's must have intended consumers to rely on its misrepresentations or its material omissions in its First Ad. Contrary to Luskin's assertion, it was unnecessary to show that the retailer *intended* to make a misrepresentation or *intended* to make material omission. Instead, the Division was only required to prove that Luskin's *intended to have consumers rely* on its statements. The plain language of the statute, viz: "with the intent that a consumer rely," clearly supports the Agency's interpretation. *Accord Golt,* 308 Md. at 11, 517 A.2d 328.

### V. Luskin's Violation of Section 13–305

■ Section 13–305(a) and (b) reads, in full:

(a) *Exception.*—This section does not apply to:

---

**22.** Even if the Agency was incorrect in its finding of fact that *no* consumer saw a sample of the VVI brochure on display at Luskin's, none of the five consumers who testified at trial had seen a copy of the brochure prior to making their purchases. Moreover, the letter from Dr. Ingersoll, which was admitted into evidence, did not state explicitly whether, prior to making a purchase, she had seen a copy of the brochure on display or whether a salesperson had given her a copy only because she had asked questions about the offer. Some of the consumers who testified stated that, in addition to not seeing a copy of the brochure, even upon making an inquiry of the salespeople, they were not given any information beyond what was in the advertisement.

(1) Trading stamps, as defined by § 13–101 of the Business Regulation Article;

(2) State lottery tickets issued under the authority of Title 9, Subtitle 1 of the State Government Article;

(3) Retail promotions, not involving the offer of gifts and prizes, which offer savings on consumer goods or services including "one-cent sales", "two-for-the-price-of-one-sales", or manufacturer's "cents-off" coupons; or

(4) Games of skill competition not involving sales promotion efforts.

(b) *Prohibition.*—A person may not notify any other person by any means, as part of an advertising scheme or plan, that the other person has won a prize, received an award, or has been selected or is eligible to receive anything of value if the other person is required to purchase goods or services, pay any money to participate in, or submit to a sales promotion effort.

Luskin's argues that section 13–305 does not apply to advertisements made to the general public. The Agency determined that this section applied, that Luskin's activities were prohibited by subsection (b), and that the exception in (a)(3) was inapplicable. We agree with the Agency.

 The prohibition created under section 13–305 is worded in broad terms. In pertinent part, it reads, "A person may not *notify* any other person *by any means* . . . that the other person . . . is eligible to receive *anything of value* if the other person is required to purchase goods." § 13–305(b) (emphasis added). The definition of "notify" is "[t]o give notice to; to inform by words or writing, in person or by message, or by any signs which are understood; to make known." *Black's Law Dictionary* 1063 (6th ed.1990). We hold that the prohibition set forth in section 13–305(b) is applicable because: (1) Luskin's newspaper and television ads did "notify" individuals, as contemplated by this subsection; (2) the airline tickets qualify as "anything of value"; and (3) that having to purchase an item from Luskin's of at least a $200 value qualifies as a requirement "to purchase goods."

In an attempt to narrow the scope of section 13–305 to make it apply only in situations where individuals received notification by mail that they were "specially selected" to receive a prize, Luskin's quotes from the Committee Report of House Bill 752, 1985 Laws of Maryland ch. 650, a bill that amended section 13–305: "The intent of the bill is to require disclosure of specified information to potential participants in contests, sweepstakes, and other prize-awarding events." Luskin's reliance is misplaced. This sentence in the Committee Report related to a portion of the statute that covers promotional events not prohibited by section 13–305(b).

In 1985, several subsections were added to section 13–305, including, *inter alia,*(c) and (d), which are nearly identical to current subsections (g) and (h), respectively. Current subsection (g) requires that one who runs a contest, sweepstakes, or other sales promotion effort *not* prohibited by section 13–305, involving the award of prizes by chance, to disclose in writing to each offeree, among other things, certain information regarding the numbers and value of prizes and the odds against winning each prize. Current subsection (h) requires the offeror of a contest, sweepstakes, or other sales promotion effort *not* prohibited by this section and not involving the award of prizes by chance, to disclose in writing to each offeree, among other things, the retail price of each prize offered and what conditions must be met in order to receive a prize. The portion of the Committee Report relied upon by Luskin's plainly is referring to these amendments and not the prohibition in subsection (b).

Luskin's argues that even if the First Ad was covered by subsection (b), it was excepted from section 13–305 coverage by subsection (a)(3), which provides that, except those promotions involving gifts and prizes, retail promotions that offer savings are excepted from section 13–305.[23] To be excluded

---

**23.** The exception under § 13–305(a)(3) was also added during the 1985 legislative session. *See* H.B. 752, 1985 Laws of Maryland ch. 650. The sentence from the Committee Report quoted by Luskin's in its brief does not refer to this exception.

under (a)(3), the retail promotion must offer savings on consumer goods or services. The First Ad simply did not *offer* any savings on consumer goods or services. As the Agency found: "The 'free airfare' offer purported to be a gift, prize, or reward; it did not purport to represent a savings on consumer goods or services." [24]

## VI. Luskin's Affirmative Defenses

### A. Accord and Satisfaction

Under *Adams v. Wilson*, 264 Md. 1, 284 A.2d 434 (1971), "Mutual intention and mutual assent to an accord and satisfaction must be found to exist in order to have an effective accord and satisfaction." *Id.* at 12, 284 A.2d 434.

 There was substantial evidence in the record to support the Agency's conclusion that there was no accord and satisfaction. The Division's evidence included the proffer that "[a]t no time during either of [the July 30 and 31 meetings] or in subsequent discussions with Luskin's counsel did the Division make any representations as to what action it would or would not take against Luskin's if the company, in fact, discontinued its current free airfare promotion." This evidence was uncontradicted.

The sworn statements by Cary Luskin, in person and in his affidavit, coupled with the proffer made on behalf of Luskin's by Thomas Wood, Luskin's attorney, simply do not include *any* evidence of a meeting of the minds between the parties. Mr. Luskin said in his affidavit, "I agreed to temporarily voluntarily remove the advertisement from both print and television media" after the meeting. Mr. Wood professed, "At both of those meetings it was indicated to me that if we Luskin's did not cease running the ad that an enforcement action would be filed in connection with the ad.... We assumed, and obviously wrongfully so, that if we stopped the

---

24. Although Luskin's boldly proclaims in its brief that the ad "offers savings on consumer goods[,]" it does not support that proclamation with *any* fact or argument.

ad that would be the end of it." These statements cannot be construed as exhibiting either a mutual intention or mutual assent that no action would be taken by the Division if Luskin's ceased its airfare advertisement.

## B. Retaliation and Selective Enforcement

■ The Agency held that the Division did not bring its charges against Luskin's in retaliation for bringing the declaratory judgment action, nor did the Division practice selective enforcement against Luskin's in taking action against Luskin's First Ad. In this regard, it said:

> While both Luskin's and the Division sought to gain control over this litigation, that, in and of itself, does not support a finding of retaliation. When Luskin's filed the complaint for declaratory judgment, the Division determined that negotiations had failed with respect to the summer, 1992 advertising campaign. Up to that point, the Division had every reason to believe that some agreement between the parties would be reached.
>
> Further, while the Division is not required to bring simultaneous proceedings against all of those engaged in identical practices, the Division has enforced § 13–305 in a number of cases.

Luskin's asserts that it did as the Division demanded—it stopped running its First Ad, and therefore, the Division had no permissible reason for filing charges against it.

There were facts, upon which the Agency legitimately relied, to support the conclusion that charges were filed for proper reasons. Evidence presented to the ALJ showed that after the July 1992 meetings, but before the declaratory suit was filed, dialogue between the parties was still ongoing. During this interim, the Division asked Luskin's for, but did not receive, the VVI brochure and travel certificate from the First Ad. This material was requested at the July 31, 1992, meeting. The fact that Luskin's filed for declaratory relief without having delivered the requested items supported the Agency's conclusion that Luskin's had signaled that its dia-

logue with the Division was at an end. At that point, the Division had no assurances that Luskin's would not renew the type of advertising scheme it used in the First Ad.

The main item of evidence presented to the ALJ that the suit brought by the Division was in vengeful retaliation against Luskin's was a statement in Mr. Wood's proffer that "[the Division's] administrative proceeding was filed, in my opinion, in retaliation for us filing our [declaratory judgment] action in Harford County." The worth of an opinion of an expert, or for that matter, a layperson, is no greater than the value of the facts upon which it is based. Mr. Wood gave no factual basis for his opinion other than the implied premise that, because the enforcement action was filed *after* the declaratory judgment action, it must have been caused by the prior action.

A causal relationship cannot be properly inferred merely because the Division filed its enforcement suit against Luskin's after Luskin's filed its declaratory action.[25] " 'Reasoning *post hoc,* [ergo] *propter hoc* [after this, therefore because of this] is a recognized logical fallacy, a *non sequitur.*' " *Karl v. Davis,* 100 Md.App. 42, 52, 639 A.2d 214, *cert. denied,* 336 Md. 224, 647 A.2d 444 (1994) (quoting *Charlton Bros. Transp. Co. v. Garrettson,* 188 Md. 85, 94, 51 A.2d 642 (1947)).

To prove selective enforcement, Luskin's was required to show that the Division took action " 'deliberately based upon an unjustifiable standard or arbitrary classification.' " *Consumer Protection Div. v. Consumer Publishing Co.,* 304 Md. 731, 751, 501 A.2d 48 (1985) (quoting *In re Laurence T.,* 285 Md. 621, 628, 403 A.2d 1256 (1979)). Luskin's contended before the ALJ that, at the time the Division brought charges against it, other companies were employing the same type of advertising scheme as Luskin's did in its First Ad, but the Division had taken no action against these other companies. Even assuming, *arguendo,* that the adver-

---

**25.** The fact that the First Ad and the Second Ad were somewhat different from each other is irrelevant to the discussion here. The advertising schemes were related, inasmuch as there were overlapping issues that affected both advertisements.

tising schemes were similar to the one used in Luskin's First Ad, there was substantial evidence to support the Agency's conclusion that the Division did not practice selective enforcement.

As the Court said in *Consumer Publishing,* "an enforcement agency 'cannot be expected to bring simultaneous proceedings against all of those engaged in identical practices.' " *Consumer Publishing,* 304 Md. at 752, 501 A.2d 48 (quoting *Ger–Ro–Mar, Inc. v. FTC,* 518 F.2d 33, 35 (2d Cir.1975)). "It is surely rational for an agency to target resources against one violator and rely on the success of that action to induce voluntary compliance or ease subsequent enforcement against others." *Id.* Luskin's did not show that the Division deliberately chose not to prosecute other companies. Moreover, the "free offer" of airfare that Luskin's made in the First Ad appeared to promise a gift of greater value, in both absolute terms and in terms relative to the required purchase, than what was offered in the majority of the other advertisements relied upon by Luskin's. This factor, combined with Luskin's nationwide recognition, supports the conclusion that the Division's decision to take action against Luskin's was a rational one.

### VII. Validity of the Agency's Final Order

### A. Injunctive Relief

The section of the Agency's Final Order dealing with nondeceptive advertising reads:

1. Luskin's shall not use advertising that creates an overall impression about a particular matter that has the capacity, tendency or effect of deceiving or misleading consumers, or that fails to state any material fact if the failure deceives or tends to deceive consumers.

2. If Luskin's makes a statement about a particular matter in an advertisement, it shall state all related material facts.

3. All statements made in an advertisement relating to a particular matter shall be disclosed clearly and conspicuously. If any statement is given prominence in the advertise-

ment, all related material statements shall be of equal prominence.

4. All statements made in an advertisement relating to a particular matter shall be placed reasonably adjacent to each other.

5. No statement made in an advertisement shall contradict or conflict with any other statement.

6. No statement made in an advertisement shall be ambiguous or make any other statement ambiguous.

 Luskin's argues that the Agency's order is too broad. It states that "the Legislature has empowered the [Agency] to issue an order requiring the violator to cease and desist *from the violation.* There is *no authority for the [Agency] to issue an order requiring that [Luskin's] not engage in other violations.*" [26] Under CPA section 13–406(a), "[t]he Attorney General may seek an injunction to prohibit a person who has engaged or is engaging in a violation of this title from continuing or engaging in the violation." The Agency "has the power to prohibit not only continued use of past advertisements but also *future* acts that involve the same violation or unlawful practice." *Luskin's,* 338 Md. at 198, 657 A.2d 788; *see also Consumer Publishing,* 304 Md. at 739–40, 772–74, 501 A.2d 48; *Consumer Protection Div. v. Outdoor World Corp.,* 91 Md. App. 275, 290, 603 A.2d 1376 (holding it was not beyond the Agency's jurisdiction to set requirements for company's notices sent in the future to inform recipients that they have won prizes), *cert. denied,* 327 Md. 523, 610 A.2d 796 (1992).

The sphere of the Agency's authority as espoused by Maryland courts is analogous to what is permissible regarding corresponding issues at the federal level. *See, e.g., FTC v. Ruberoid Co.,* 343 U.S. 470, 473, 72 S.Ct. 800, 803, 96 L.Ed. 1081 (1952) (citations omitted). Therefore, we look to federal

26. Luskin's cites CPA § 13–403(b)(1) in support of its assertion, highlighting the following clause: "[the Agency shall] ... *issue an order requiring the violator to cease and desist from the violation and to take affirmative action, including the restitution of money or property.*"

cases for guidance as to any restrictions that need to be placed on the Agency's ability to control future advertising.

■ Under federal law, the remedial order must be reasonably related to the unlawful practices found to exist. *See, e.g., AMREP Corp. v. FTC,* 768 F.2d 1171, 1179 (10th Cir. 1985) (citing *FTC v. Colgate–Palmolive Co.,* 380 U.S. 374, 392, 85 S.Ct. 1035, 1046, 13 L.Ed.2d 904 (1965)). In prohibiting Luskin's from deceptive advertising, the Agency's order conceptually addressed future advertisements by requiring Luskin's to state all material facts, to state facts clearly, to place facts in reasonable location to each other and in equal prominence to each other, and to eschew conflicting or ambiguous statements. The Agency's order was reasonably related to the violations Luskin's committed with its First Ad, and did not exceed the Agency's authority.

■ Luskin's also argues that the injunctive relief regarding non-deceptive advertising was vague because certain words used in this section were undefined. It maintains that the Agency's order was "remarkably similar to the order held impermissibly overbroad in *Country Tweeds, Inc. v. FTC.,* 326 F.2d 144 (2d Cir.1964)." We disagree.

In *Country Tweeds,* the petitioners misrepresented the quality of their cashmere by altering test results from a comparison of cashmere fabrics conducted by the United States Testing Company (USTC). *Country Tweeds,* 326 F.2d at 145. The cashmere fabrics were produced by two manufacturers, Country Tweeds's current supplier and its former supplier. Country Tweeds deleted portions of USTC's report in order to mislead its dealers into thinking that the cashmere it currently used for making its coats and other types of clothing was the best on the market. Despite the very specific manner in which Country Tweeds had violated the FTC Act, the FTC had ordered "petitioners to refrain from 'misrepresenting *in any manner* the quality of cashmere or other fabric in their merchandise.'" *Id.* at 148 (emphasis added). In contrast to the order in *Country Tweeds,* the Agency's order

in the instant case gave clear instruction to Luskin's as to the requirements for its advertising.

The Agency was not required to define each word it used in the order. A definition is necessary only if the word has special meaning, that is, a meaning different from its ordinary and common usage. The Agency used, but did not define, words or phrases such as "equal prominence" and "adjacent" in prohibitions (3) and (4), respectively. According to Luskin's, these undefined terms made those prohibitions vague. Luskin's, however, merely needs to give these words their plain meaning. Moreover, certain legal terms of art that were not defined in the Agency's order, such as "material facts," have already been defined by Maryland case law. Therefore, the Agency was not required to spell out definitions for such terms of art. The Agency's order was written with sufficient specificity.

### B. General Restitution

As mentioned earlier, the Agency's order provided for consumers to receive airfare tickets, or their cash value. In *Outdoor World,* this Court held that, although we remanded the case, "we s[aw] no legal deficiency in those provisions of the [Agency's] order requiring [the defendant] . . . to pay the value of prizes to those persons currently holding certificates of redemption who also were misled into thinking the prize would be given without condition." *Outdoor World,* 91 Md. App. at 293, 603 A.2d 1376. Therefore, the Agency's starting point is permissible.

Luskin's asserts that the Agency's order for affirmative relief is "punitive" and "contrary to law." It makes several arguments in regard to the restitution order, including: (1) consumers are receiving more than they would have under Luskin's offer because they receive the tickets regardless of their willingness to purchase the minimum hotel stay and to abide by other details; (2) a greater number of consumers will make claims for the tickets because a consumer needs to state not that the advertisement was the only reason but merely *one* of the reasons the consumer purchased the item from Lus-

kin's; (3) Luskin's did not have an opportunity to put on evidence on the issue of restitution; (4) consumers cannot be entitled to restitution unless they tender back whatever goods they purchased at Luskin's; and (5) Luskin's is not provided an opportunity to challenge individually each consumer claim regarding the issue of reliance on the advertisement.

We reject Luskin's first argument for two reasons: (1) it erroneously implies that the First Ad alerted potential customers to the fact that they would have to purchase minimum hotel stays from someone affiliated with Luskin's; and (2) the Agency has discretion to fashion an appropriate remedy. Clearly it is not to be expected that the Agency could or should replicate the exact details of the Luskin's offer in the relief order.

Argument number two is easily answered. Reliance need not be of the "but for" variety, i.e., if it were not for the advertisement, consumers would not have made their purchases at Luskin's. See Consumer Publishing, 304 Md. at 780, 501 A.2d 48 (stating, in reviewing a restitution order, that it was reasonable for the hearing officer to infer that the impressions conveyed by the company's advertisements would influence a consumer's decision to purchase).

We reject argument number three because Luskin's was on notice through the Statement of Charges that restitution was sought by the Division. Therefore, Luskin's was given an opportunity to put on evidence in regard to this issue.

Argument number four is founded on the "tender back" rule as set forth in Consumer Publishing, 304 Md. at 777, 501 A.2d 48. In that case, the Agency ordered the defendant to restore to its misled customers the money it had received from them as a result of its deception. Under the tender back rule, the consumer is "generally required to disaffirm the contract and restore what he received under the bargain, or at least offer in good faith to restore it, before the defendant is required to restore what he received." Id. The tender back rule does not apply in this case. The purpose of the relief granted to Luskin's customers was not to restore them to their original

positions prior to their purchases, but to allow the consumers to receive what Luskin's promised in its First Ad. Because Luskin's was not ordered to return the money it received from the consumers for the merchandise they purchased in order to qualify for the "free airfare," the consumers were properly permitted to keep their merchandise.

We also reject argument number five. In both *Consumer Publishing* and *Outdoor World*, the cases were remanded because the orders did not provide for any method to assure that individual consumers relied on the advertisements. *See Consumer Publishing*, 304 Md. at 781, 501 A.2d 48; *Outdoor World*, 91 Md.App. at 291, 603 A.2d 1376. There was no "procedure for processing individual consumer claims." *Consumer Publishing*, 304 Md. at 781, 501 A.2d 48. "The purpose of the claim procedure required by the Court [is] to determine, on an individual basis, which customers did rely on [the deceptive] statements and which did not, allowing restitution only to those who did." *Outdoor World*, 91 Md.App. at 291, 603 A.2d 1376. These cases, however, are explicit in stating that actual proof of reliance is unnecessary. The Agency "may include a general restitution provision in a cease and desist order without direct proof of consumer reliance." *Consumer Publishing*, 304 Md. at 781, 501 A.2d 48; *see also Outdoor World*, 91 Md.App. at 290–91, 603 A.2d 1376. Other than the requirement that all consumers must state that they relied on the false impression created by the advertisement, it is

> not ... necessary that each purchaser present additional evidence that he was actually deceived and relied on the misrepresentations in the advertisements. To require proof of reliance, beyond the purchaser's statement, would make recovery difficult and complicated.

*Consumer Publishing*, 304 Md. at 781, 501 A.2d 48.

In the instant case, the Agency's order does require consumers to state that they relied on the advertisement. The order also provides an individual claims process to evaluate

47

each claim for consumer eligibility. No more is required under *Consumer Publishing* and *Outdoor World.*

**JUDGMENT REVERSED; CASE REMANDED TO THE CIRCUIT COURT FOR HARFORD COUNTY WITH INSTRUCTIONS TO REINSTATE THE DECISION AND ORDER OF THE AGENCY; COSTS TO BE PAID BY APPELLEE.**